FANNY C. WILLIAMS *v.* ODESSA & MIDDLETOWN RAIL-
WAY CO.

New Castle, September Term, 1895.

Railroads — location of; What constitutes; Right to aban-
don a proposed route and select another; Liabilities on
condemnation proceedings; Eminent domain; Inquisi-
tion and condemnation proceedings; Election.

1. It is the settled law of this State that the condemnation
proceedings alone establish nothing, vest nothing, and
fix nothing except only the price at which the land
inquired upon may be had from the proprietor by the
corporation.

2. The award of freeholders on condemnation proceedings
does not, of itself, render the corporation liable to the
landowners for the amount fixed by the award.

3. Upon an abandonment by a corporation, after condemna-
tion proceedings, of a proposed route, the corporation
is liable not only for the cost of such condemnation
proceedings, but also for all damages and expenses rea-
sonably incurred by the owners of land along such
abandoned route, by reason of those proceedings.

4. Except through *laches* or waiver, the power of election
cannot be lost, except by such a selection of one of the
subjects or rights embraced by the election, as con-
fers a positive right to the subject or right so selected,
upon the party in whom the power of election once
existed.

5. In order to constitute such a location of the route of a
railroad in this State as will exhaust the power of
eminent domain conferred in its charter, some acts must

Syllabus.

be done which vest mutual rights or liabilities between the corporation and landowners along such route.

6. A location is not a mere right, it is an act; it is not a power to do a thing, it is the thing itself.

7. Difference between the English law in regard to railroad corporations and condemnation proceedings, and that in this State.

8. By the charter of the O. & M. railway, the respondent, it was provided "that the said company shall have power to locate, survey, and purchase such lands and rights of way within the limits of New Castle County as said company may deem necessary for their purpose," the termini being specified; and by another provision of the charter, the mode of having freeholders appointed for inquisition and condemnation proceedings, was fixed, and it was then provided that "the said freeholders, or a majority of them, shall certify their finding and award to both parties, whereupon the said company, upon paying the damages so assessed, or depositing the same in the N. C. N. Bank, to the credit of said owner or owners, shall become entitled to have, use, and enjoy said lands and rights of way for the purpose of said company forever." The respondent proceeded to survey its proposed route. Being unable to agree as to the price of the lands desired, condemnation proceedings were had under its charter. The respondent and all parties interested were present, either in person or by attorney, during these proceedings and at the announcement of the award. Immediately upon this announcement the respondent asserted that the damages fixed were more than it could pay, and notified the freeholders that it was unnecessary to serve notice of the award as provided in its charter. No such notice was in fact served, and neither the whole nor any part of the damages was paid, tendered, or deposited as provided in the charter. Subsequently, the

respondent applied for and secured the appointment of another set of freeholders for the condemnation of a right of way over another and entirely different route; *held,* that the survey and condemnation proceedings over the first route did not exhaust the power of eminent domain conferred upon the respondent by its charter, and that it had the right to change its first proposed route.

INJUNCTION BILL.— It is admitted and agreed by and between the complainant and respondent respectively that the statement of facts hereinafter set forth is a true and correct statement thereof, and that for the purposes of argument and the decision of this cause, shall be held and taken to be conclusively proved and established:—

First. That the complainant, Fanny C. Williams, of St. Georges Hundred, New Castle County, and State of Delaware, is seized in fee-simple of a certain lot or tract of land situate in the Town of Middletown, in said hundred, containing about two acres and eighteen perches of land, more or less, lying and being on a certain private lane or street, commonly known as Hamtown lane, but being in fact a continuation of Lake street, in said town, said lane or street on which said lot is situate, and which extends to the center line thereof, having been opened by the owners of the lots fronting thereon, but never having been dedicated to public use, which said lot is particularly bounded and described as follows, to-wit:    All that certain lot, piece or parcel of land, situate on the north side of Lake street, in Middletown, county and State aforesaid, containing within the following metes and bounds, to-wit:    Beginning at a stake in the centre of Lake street, a corner for this lot and the land of Mary H. Jones; thence with

20

said Lake street south eighty-one and one-quarter degrees west nine perches and thirteen links to a stake in said Lake street, a corner for a lot of Benjamin T. Biggs; thence leaving Lake street and running with the line of the said Benjamin T. Biggs, north eight and three-quarters degrees, west thirty-four perches and fifteen links to a stake in George F. Brady's line, a corner for this lot and land of the said Brady and Biggs; thence with land of said Brady, north eighty-seven and three-quarters degrees, east nine perches and fifteen links, to a stake in said line, a corner for this lot and land of the said Mary H. Jones; thence with the land of the said Mary H. Jones, south eight and three-quarters degrees east, thirty-four perches and eight links to the place of beginning.

Second. That by an act of the General Assembly of the State of Delaware, passed at Dover, April 8, 1873, entitled "An act to incorporate the Odessa & Middletown Narrow Gauge Railway," being chapter 513, vol. 14, Laws of Delaware, page 560, and by another act of said General Assembly, passed at Dover, January 30, 1889, entitled "An act to amend an act to incorporate the Odessa & Middletown Narrow Gauge Railway, passed at Dover, April, 8, 1873," being chapter 620, vol. 18, Laws of Delaware, page 769, the same being an amendment to the act first mentioned, a company was chartered and incorporated and authorized to be organized under the name, style and title of " Odessa & Middletown Railway," for the purpose and with the powers described and limited in and by said acts; and that the said acts of assembly, being public acts of the State, and published as aforesaid as such, may be re-

ferred to and used for all purposes material to the proper and correct argument and decision of this cause.

Third. That the said defendant, the company incorporated by said acts, as provided therein and thereby, having been duly organized under said acts, and officers thereof having been elected and appointed after numerous surveys, selected a route for the proposed railway and the line along which it intended to construct the same, provided the damages which might be assessed for the right of way when assessed did not exceed the amount which the said company felt able and willing to pay, and designated and staked out said line over the lands of those persons whose lands were crossed by its said proposed railway, drew plans and maps of the same for its own use, showing the route, distances, width and grades of its proposed roadway, and with the necessary data for its own use, and for the use of the commissioners and freeholders who were afterwards called on to condemn certain portions thereof in viewing the lands to be condemned and ascertaining the damages to be awarded; and that said line so selected and marked and designated as aforesaid, began at a point in the Town of Odessa, formerly Cantwell's Bridge, in said hundred near the bridge over the Appoquinimink creek, and extended thence in a generally westerly direction through, over and across lands belonging among others to the heirs or devisees of William M. Vandegrift, deceased, Samuel Pennington, John C Corbit and Mary Appleton, thence in a generally northwesterly direction, through, over and across lands belonging to the said Mary Appleton, a short distance through and along the public road leading from said Town of Middletown

to the Town of Odessa, then through, over and across lands of Mary Vail, of the heirs of John Alston, of Mary N. Merritt, Edwin R. Cochran, Charles Johnson, Lydia A. Price, George F. Brady, of the heirs of Col. Joshua Clayton, of Mary Ash and of Samuel Pennington to the main line of the Delaware railroad, but at no point on said line so selected and designated did said line touch, enter upon or affect any of the lands of said complainant described in her bill of complaint filed in this cause, or occupy or affect in any way said Hamtown lane or Lake street, or any right of way belonging to said complainant or appertaining to said lands described in her said bill, and a plot of the route above described showing the location of said line and the lands of the complainant is appended to this statement and to be taken as a part thereof.

Fourth. That said defendant company agreed with certain of the owners of the lands through, over and across which its said line was staked out and designated as aforesaid for the purchase of and obtaining the lands and rights of way necessary for the purposes of constructing the railroad provided for by said act, and the use of said railway, but, having been unable to agree with all the owners of lands through which its said proposed line was to be constructed for the purchase of such lands and rights of way as were required for its purposes and the purposes of said acts, on the 27th day of August, A. D. 1889, applied as required by said act first mentioned, to the Chief Justice of the State of Delaware, to appoint five judicious and impartial freeholders of said New Castle County to view the premises through and over which the proposed line so staked out

and selected would pass, and upon said application, his Honor, the Chief Justice aforesaid, duly and properly appointed and commissioned five judicious and impartial freeholders of said county, to-wit:    Henry A. Nowland, Nathaniel Williams, Henry Cleaver, John T. Cheairs and Henry H. Appleton, as provided in section 6 of the said first-mentioned act, to view the premises of those landowners through which said railway was to be constructed, and assess the damages, which such of the owners who had not agreed with said defendant company as aforesaid, would sustain by reason of the taking of the said lands and rights of way for the use of said company, and annexed hereto is a true and verbatim copy of the application of said defendant company to the Chief Justice, and of the order of the Chief Justice thereon, and that the same shall be taken as a part of this statement.

Fifth. That the said freeholders so appointed duly and properly qualified themselves, elected said Henry A. Nowland their chairman, and, as required by said act, condemned said lands and rights of way through and over said disagreeing owners, and on or about the 15th day of October, A. D. 1889, assessed the damages of said landowners with whom said defendant company was unable to agree, fixing the amounts as shown in a paper appended to this bill, filed in the cause, and which shall be taken as a part thereof — and notified said company of such awards, and said company learning the amount of said awards or assessments, declared that they, the said awards and assessments, were so large that said company could not afford to pay the same, and that said road or railway so selected could not be con-

structed by it, and none of said amounts so assessed or awarded as damages have ever been paid, tendered or deposited in bank, as required by said act.    The facts respecting the notification of the company and the circumstances relating thereto being as follows:    Many or all of the landowners whose lands were to be condemned for the use of said defendant were notified of the day, hour and place of meeting of the commissioners or freeholders by William R. Polk, representing the company in the name of said commissioners, and then and there appeared some in person and some by their attorneys, the said respondent being represented by said William R. Polk, and after viewing the lands of the said owners respectively, and hearing the statements and arguments of the attorneys, and owners, and said William R. Polk, representing the company, and duly considering the same, the freeholders decided upon the awards aforesaid for the owners respectively.    And the said Nathaniel Williams who had been made secretary of said board, informed said William R. Polk that written notices of said awards and the amount thereof should be given the landowners respectively and offered to furnish said Polk with a copy of a proper form in which said notices should be drawn, but said Polk representing said respondent, stated to said Nathaniel Williams that it was no use to take the trouble of preparing and serving such notices, that the respondent could not pay the amounts awarded as damages by said freeholders or commissioners, as it had not enough money, and the railroad could not be built on that line, and no one, either respondent or freeholders, gave or prepared any formal written notices of the awards to any of the

landowners whose lands said line was selected and to be constructed as aforesaid, and none of said owners received the formal written notices provided for by said acts, but all were present or represented, and had verbal notice of the amounts of respective awards as shown in the list appended to the bill of said complainant, and so matters remained until the latter part of the year, A. D. 1891, when said company, without any further grant or delegation to it of the right to exercise the right of eminent domain by said General Assembly, applied a second time to his Honor, the said Chief Justice, for the appointment of other freeholders as aforesaid, to condemn lands and assess damages to owners along an entirely different route, and his Honor, the said Chief Justice, appointed William Cooch, John Pilling, Theodore F. Armstrong, James Garman and Henry H. McMullin to view the lands of those owners with whom said defendant company could not agree, for the purchase of rights of way required for a line of railroad which said defendant company hath commenced to construct, beginning at a point near the Phosphate Works, now or late of Lord and Polk, in the Town of Odessa, thence running through the streets of said town, and through and along the public road between the said Towns of Odessa and Middletown, to a point at or very near the limits or boundary of said Town of Middletown, thence along the road known as Hamtown road, to or near its intersection with said Hamtown lane, or Lake street; thence down the said lane, over and across the lands of the complainant, as above described, and lands of other persons in said lane, into Lake street proper; and thence down the same and

across lands of Samuel Pennington to the main line of the Delaware Railroad, in the Town of Middletown, which route is shown in red ink on the plot hereinafter referred to and hereto appended.

Sixth. That said freeholders last appointed as aforesaid on Tuesday, the 12th day of January, A. D. 1892, at the instance and request of said company, and under color of authority of said acts, and said appointment as aforesaid went upon said described lands of said complainant and against her protest formally made to them by her solicitor undertook, pretended and proceeded to assess her damages for a right of way across her said lands for the use of said defendant company on the line last described and awarded as her damages the sum of $25, which she is unwilling and refused and refuses to accept, said complainant then and now claiming that all of said last described proceedings were unlawful and without any lawful authority whatsoever, but said deponent did deposit the said sum of $25 awarded to said complainant as damages to the credit of said complainant in the New Castle County National Bank of Odessa, and did cause to be tendered to her a certificate of the cashier of said bank to that effect, but she has never drawn or used said money.

Seventh. That said defendant claiming to act under and by authority of said acts of the General Assembly, and claiming that the condemnation of said complainant's lands as aforesaid, and the assessment and deposit for her damages as aforesaid, hath been duly and legally authorized and performed, is engaged under color of the authority granted by said acts in constructing the roadbed for a railroad on a part of the public

road leading from Middletown to Odessa, in St. Georges Hundred, New Castle County, without other proceedings or powers than those herein set forth, the Town of Odessa being about three miles distant from the Town of Middletown, and intends to place thereon railroad ties and rails between the northerly side of said road and the center thereof, and to operate a railroad through and along said road on the line being graded as aforesaid, and thence to extend the same across a corner of land of Mary N. Merritt into said Hamtown road; thence through and along the same to said Hamtown lane; then down the same and across the lands of said complainant as aforesaid, which, under color of the condemnation proceedings and assessment of damages as aforesaid, it intends to take for the use of it, the said defendant company, and to construct thereon a railroad as aforesaid and to operate the same against the will and wish of said complainant.

And the said complainant claiming that said acts threatened and done are and were unlawful, filed her bill in this cause praying relief as therein set forth, and said defendant claiming that all of said acts complained of and above set forth are lawful, hath answered thereto, and both of said parties to this cause have agreed that the facts which could be proven by them respectively, are as set forth in this statement.

WILMINGTON, DEL., *Aug. 27, '89.*

To the Hon. J. P. COMEGYS, *Chief Justice, Dover, Del.*

In pursuance of the 6th Section of an Act to Incorporate " The Odessa and Middletown Narrow Gauge Railway," passed at Dover, April 8th, 1873, (see Acts of 1873, page 560, chapter 513), and an Act passed

January 30th, 1889, amending said act. (See Acts of 1889, page 769, chapter 620.)

I, as president of the Odessa and Middletown Railway Co., would respectfully ask that you appoint at your earliest convenience five freeholders, as commissioners to view the line of said railway as proposed and assess damages to the owners of lands through which it may pass. With much respect, I am,

Very truly yours,

WM. TAYLOR,

*President of the Odessa & Middletown Railway Co.*

AT CHAMBERS, DOVER, *September* 2, 1889.

In pursuance of the above application, and of the authority conferred upon the Chief Justice for that purpose by the sixth section of chapter 513 of the Laws (vol. 14, p. 560), I do, as such Chief Justice, hereby appoint the following judicious and impartial freeholders of New Castle County to perform the duties designated by said section, viz.: John P. R. Polk, Henry Cleaver, Henry H. Appleton, John T. Chairs and Nathaniel Williams.

In witness whereof, I have hereunto set my hand, the day and year aforesaid.

J. P. COMEGYS,

*Chief Justice of Delaware.*

And now, to-wit, this 17th day of September, 1889, it appearing that by the statement of John P. R. Polk, that he is not a freeholder of New Castle County, I therefore appoint Henry A. Nowland in his place.

J. P. COMEGYS,

*Ch. J.*

Willard Saulsbury, for complainant.

The contention in this case on the part of the complainant is that the commissioners first appointed by the Chief Justice having performed their duties are *functus officio*, and having exhausted all powers in them invested, and that subsequent commissioners could be legally appointed; and, that the line as first selected, designated, marked out, staked out, mapped and condemned, could not be changed or varied, that all right of eminent domain delegated to the company has been exhausted.

Acts of assembly delegating the right of eminent domain must be strictly construed.    Cooley's Const. Lim. *530.

So soon as the company locate their road and have made an effort to agree with the landowner, and not before, the process may be commenced by either party, for ascertaining the damages; and when they have been ascertained, by report and judgment thereon, the judgment settles the right of landowner to such damages, just as completely as any other judgment, and he has just the same right of execution upon it.    The power of taking any man's land is exhausted by a location which it is too weak to retain; it cannot be indulged with another choice.    Neal v. P. & C. R. R. Co., 2 Grant's (Penn.) Cas. 137.

Locating is the act of selecting and designating land which the person making the location is authorized to select.    City of Richmond v. County of Henrico, 2 S. E. Rep. 30.

Location is the designation of the boundaries of a particular piece of land, either upon record or the land itself.    Black's Law Dict. 730.

Location is often applied to *denote* the act of selecting and marking the line upon which a road, canal or highway is to be constructed.    Bouv. Law Dict.

The word " locate " is a term of art in which the Legislature can have but one meaning, as was said by Shaw, Chief Justice, " the effect of the location is to bind the land described to that servitude."    Abbott v. N. Y., N. E. R. R. Co. (Mass.), 15 N. E. Rep. 100; B. & P. R. R. Co. v. Midland Ry. Co. et al., 1 Gray, 340.

The act of assembly chartering this corporation distinguishes between " location " and " construction." The words are " locate and construct."    14 Del. Laws, 560.

The words " locate " and " location " are terms which have long been used in the land laws of this and other States, and have acquired, as used in other States, a fixed signification.    So they have been used in regard to railroads from the first introduction of this species of highways in England and in this country; and if any question arises in a particular case as to the sense of either of them, its sense must, by the court, be gathered from its use, as it learns and knows the sense of all other terms.    N. & N. W. R. R. Co. v. Jones et al., 2 Coldw. (Tenn.) 595.

When a railroad company filed its location in a proper manner, and with an accompanying plan, and plaintiff's land was included in said location, although his name did not appear in said location and plan as one of the owners, the failure of the company to furnish plaintiff

with a plan of the land taken under Public Statutes, Massachusetts, chapter 112, section 106, does not affect the company's title or suspend the running of the time for applying for damages.    Brocks v. Old Colony R. R. Co. (Mass.), 15 N. E. Rep. 555.

Code N. C., § 1952, requires a railroad company, before constructing any part of its road, to survey the line of the proposed road, make a map thereof, file certificates that it has located its road according to such surveys, give notice, etc.; and section 1944 requires that performance of these conditions shall be alleged in the petition in proceedings to condemn lands.    Held, that performance of these conditions was indispensable and that failure to allege the same was fatal.    Durham & N. Ry. Co. v. Richmond & A. R. R. Co. (N. C.), 10 S. E. Rep. 1041.

The location of a line is always a prior step to its purchase or condemnation.    Little Miami R. R. Co. v. Naylor, 2 Ohio St. 240; L. S. & M. S. R. R. Co. v. N. Y., L., etc., R. R. Co., 89 N. Y. 442.

A little thought makes it apparent that location is prior to condemnation, for if it were not, the commissioners would not know what to condemn.

Having, therefore, established most conclusively that the defendant corporation did in fact legally locate its line of railway, the next question to be considered is, having so established its line in a strictly legal sense, and, in fact, could it thereafter make any change in its line, if such change necessitated the exercise of the right of eminent domain?    We think clearly it could not, which we think will be as conclusively established by

the following authorities, as has been the fact that a location was in reality made.

Grants of corporate power, being in derogation of common right, must be strictly construed. This is especially true when the power claimed is the delegation of the right of eminent domain. Cooley's Const. Lim. *530, *660.

Statutes delegating the right of eminent domain to railroad and other corporations for public use, being in derogation of common rights, are not to be extended by implication, but are to be strictly construed. Am. & Eng. Ency. of Law, p. 522, vol. 6; 46 N. Y. 546; 7 Am. Rep. 385; 26 Penn. St. 355; 43 Eng. C. L. 954.

Only one condemnation is allowed. New authority must be obtained for a new condemnation. The principle of no second exercise of eminent domain grows out of the old law of election, viz.: If one has an election and determines it, it is determined forever. Com. Dig. Election, chap. 2; Pierce on Railroads, 254.

The power of eminent domain delegated by the legislative enactment is exhausted after one exercise. Mills on Em. Dom. 58; 35 Barb. 373; 32 id. 358; 9 Paige, 323; 10 Bush, 529; 1 Allen, 316.

When a corporation chartered for the purpose of constructing a railway has located its line, it cannot change the location and adopt a new route, unless the power to do so is expressly granted in its charter, and then only in the manner indicated. When the power thus conferred upon a company has once been exercised, it is exhausted. Mason v. Brooklyn & Newton R. R. Co., 35 Barb. 373.

When authority is given to locate and construct a road upon a route to be indicated in a certain manner, that route, when thus indicated, is in effect incorporated in the charter, as if the authority thus conferred were expressly and distinctly confined to the precise route laid down in the subsequent proceedings; and the powers of the company are as finally and effectually limited to that precise line of road as if such were the express provisions of the charter. Mason v. Brooklyn & Newton R. R. Co., 35 Barb. 373.

A railroad having made its location and adhered to it for many years, it is concluded by what it has done. Brooklyn Central R. R. Co. v. Brooklyn City R. R. Co., 32 Barb. 358.

A railroad having legally located and established their road between the termini presented in their charter, their whole power has been exerted and exhausted. Francis Bringham v. Agricultural R. R. Co., 1 Allen, 316.

Statutes derogatory to private rights must be strictly construed. The right to "locate and construct a railroad" can be exercised but once without a further grant. Moorhead v. Little Miami R. R. Co., 17 Ohio St. 340, 349, 350, 351.

When a railroad has once selected and located its route it cannot change it. Little Miami R. R. Co. v. Naylor, 2 Ohio St. 236, 238, 239, and syllabus.

When a corporation chartered for the purpose of constructing a railway has located its line, it cannot change the location and adopt a new route; when the power thus conferred upon a company has once been exercised, it is exhausted. Mason v. Brooklyn City & N.

R. R. Co., 35 Barb. 373, 381; Morris & Essex R. R. Co. v. Central R. R. Co. of N. J., 31 N. J. Law, 205-209; People v. N. Y. & Harlem R. R. Co., 45 Barb. 78.

To admit the right to excessive exercise of the power would be to subject all the land in the State to condemnation at any future time. Mill's on Eminent Domain, p. 58.

It is the very sensible rule of the common law, " that if a man once determines his election, it shall be determined forever." Com. Dig. Election, chap. 2. The maxim has been deemed peculiarly applicable to acts done under the authority of the State, and it has been held, repeatedly, that the powers given to a corporation to take lands, when once exercised, are exhausted. Thus the right of a railroad company, after the road was actually located, .to make a relocation or to abandon the route adopted by them for a more eligible one, was entirely repudiated in Moorhead v. The Little Miami R. R. Co., 17 Ohio St. 340; Morris & Essex R. R. Co. v. Central R. R. Co., 31 N. J. Law, 205.

" When the canal is completed, the powers of the company are exhausted, and in making the canal, the proprietors are not at liberty afterwards to injure the interests of parties, by making what is quite a different canal." This principle applies with equal force to railroads. Blackmore v. The Glamorganshire Canal Co., 1 Myl. & Keene, 154.

When the choice of discretion as thus given by statute has been exercised, the power is exhausted, and the location cannot be changed. Lewis on Em. Dom., § 258.

The practical location of a railroad within the pre-
scribed limits would exhaust the power conferred, and
prevent a subsequent change of location, except by con-
sent of the Legislature.   The People v. N. Y. & Harlem
R. R. Co., 45 Barb. 73.

When a road has once been opened, its location can-
not afterwards be altered for the purpose of placing it
on what may be supposed to be its proper site.   If it can
be moved once, it can be moved twenty times upon the
same principle.   All authority under the order to open
is exhausted by the action of those to whom it was di-
rected, and cannot be resumed, although the first loca-
tion was not according to the report of the viewers.
McMurtrie v. Stewart, 21 Penn. St. 322, 325; 48 id.
305.

However it may be with railroad companies formed
under general laws, when a company established by a
special charter has once fixed its location, and taken the
necessary steps to establish it, its power of election hav-
ing been exercised, it has no power to recall or change
it without the consent of the Legislature, even though
the change only involves the exercise of a power which
they possessed and which they have exercised under the
charter in the first instance.   2 Wood's Railway Law,
§ 238.

When the charter of a railroad company merely fixes
a few points through which the road is to pass from its
commencement to its terminus, leaving the location of
the roads between the points specified to the discretion
of the corporation, the railroad company having once
located the road, their power to relocate and for that

21

purpose to appropriate the property of an individual has ceased.    2 Ohio St. 236.

In laying out turnpike companies, the power of locating gates, given by the charter, is exhausted when the power is once exercised, and consequently the company has no power to subsequently remove the gates to other places.    The laying out of railroads being similar to that of turnpikes, the same principle will apply. Hartford, New London, etc. v. Hosmer, 12 Conn. 360; The State of Conn. v. Nor. & Dan. Turnpike Co., 10 id. 157.

The railroads of this State have all recognized the foregoing doctrines and principles by obtaining special legislation to enable them to widen their rights of way and by obtaining branching powers.    17 Del. Laws, W. & N. 309; 17 Del. Laws, P. W. & B. 299.

Railway companies may have experimental surveys at pleasure, before finally locating their route, but they cannot have experimental suits at law, as a means of chaffering with landowners for the cheapest route. The power of taking any man's land by such company is exhausted by location.    It cannot be indulged with another choice.    Neal v. Pittsburgh & Connellsville R. R. Co., 2 Grant's (Penn.) Cas. 137.

Edward Ridgely and Henry Ridgely, Jr., for respondent.

The single question in this case is, did the act of this respondent, a railway corporation duly incorporated under the laws of Delaware, in having surveyed one particular route between the termini specified in its charter,

the Towns of Odessa and Middletown, and having condemned certain lands of disagreeing landowners along such route by condemnation proceedings authorized under its charter, but no certificate of the award being made, and no payment, tender, or deposit of the damages awarded, exhaust the power of electing a route between those termini conferred by its charter? If the answer be " yes," then, unquestionably, this respondent had not the right to apply for and secure a new condemnation by a new set of freeholders of land along a new route between those said termini; but if it be " no," it is equally certain the complaint can have no further standing in this court.

In the consideration of the question propounded, it is well to clear away all unnecessary and extraneous matter. In this manner we shall escape any disturbance proceeding from the citation of authorities based upon general railway, or general corporation, statutes. Delaware, unlike so many of her sister commonwealths, has absolutely no general statute of this kind in anywise affecting the question before the court. Further, no nice question, as to the right of the same set of freeholders or inquisitors to sit more than once as a condemnation jury, need trouble us. Here was a new and distinct set of freeholders appointed under a new and distinct application.

With this mass of confusing matter thus disposed of, we are left simply with the provisions of the act of incorporation of this respondent company itself, and those general principles governing eminent domain and its exercise by private corporations, independent and apart from that class of statutes to which we have referred as being entirely absent in the jurisprudence of this State.

In the consideration of the charter of this Odessa & Middletown railway, it must first of all be noted that the route of the proposed railroad is not set forth, nor described with any degree of particularity. This is a most important point. See the language of the charter itself.

By section 9 of the act of incorporation (Laws of Del., vol. 14, p. 562), it is provided: "That the said company be, and they are hereby authorized, to locate and construct a railway from any point on the northwest side of the Appoquinimink creek, in the Town of Odessa, extending through and along such of the public streets, and so much of the public roads in St. Georges Hundred, as they may select for that purpose, to some point within the town limits of Middletown," etc. And in section 6 of the same act (p. 561), it is provided: "That the said company shall have power to survey, locate, and purchase such lands and rights of way within the limits of New Castle County as said company may deem necessary for their purpose," etc.

It would seem unnecessary to dwell upon the wide range thus conferred upon the company, in which to select their proposed route. Even as to the very termini there is considerable scope. One point can be anywhere on the northwest side of the Appoquinimink creek in the Town of Odessa, and the other point of termination can be any point whatever in the Town of Middletown. As to the line of route between these termini, nothing of limitation whatever is made, except it be as to the "public roads in St. Georges Hundred."

From these provisions, it is very manifest that the

case now before the court is very different from those in which the charter did specifically limit and define the route.

Still another point in this connection is to be noted. In this State there is no general statute, nor any provision in the charter of this respondent company, requiring the filing of a map or description of the proposed route in some public office, before the work of construction. So here again is very apparent the striking dissimilarity between the present case and those where, either by the charters themselves, or by general statutory provisions of the States in which such cases have arisen, the filing of such a map or description is a necessity which has been complied with by the railroad company.

An appreciation of this fact will remove still other elements of possible disturbance.

Since then the General Assembly, the supreme power of this State, has been so liberal in thus conferring such breadth of selection as to the route of the Odessa & Middletown railway, why should the court seek to curtail it? The principle of law that statutes delegating the power of eminent domain must be construed strictly will not, we submit, avail to justify such curtailment. That principle can only be applied where the act itself is ambiguous, never in the teeth of positive and express provisions.

We are narrowed down to the conclusion, then, that only some act of this respondent itself, subsequent to its charter, will have such an effect.

The Odessa & Middletown Railway Company did survey one proposed route, and did apply for and secure the

appointment of a set of freeholders to condemn certain lands along such route. Further, those freeholders did actually sit and assess damages for such lands. These, and these alone, constitute all the acts of this respondent subsequent to its charter up to the time when it made its application for a new set of freeholders to condemn lands along another route.

We are brought, then, to the first question, did all of these acts, or any one of them, exhaust the power of election as to its route, conferred by the charter?

The following authorities will be found to fully prove that such is not the case: Baltimore & Susquehanna R. R. Co. v. Nesbit, 10 How. 395; Moritz Schreiber et al. v. Chicago & Evanstown R. R. Co., 115 Ill. 340; Chicago, St. Louis & Western R. R. Co. v. Gates, 120 id. 86; D. & N. O. R. R. Co. v. Lambform, 8 Colo. 380; Graff v. Mayor & City Council of Baltimore, 10 Md. 544; Morris et al. v. Mayor and City Council of Baltimore, 44 id. 598; Cherokee Nation v. Southern Kansas R. R. Co., 135 U. S. 641; Manchester & Keene R. R. Co. v. Keene, 62 N. H. 81; Hayes et al. v. Cincinnati & Indiana R. R. Co., 17 Ohio St. 103; N. M. R. R. Co. v. Lackland, 25 Mo. 515; In re Washington Park, 52 N. Y. 144; Black v. Mayor and City Council of Baltimore, 1 Md. 235; Burlington & Missouri R. R. Co. v. Sater, 1 Clark (Iowa), 421.

Many of the books are full of the statement, that a location exhausts the power of eminent domain, but there is a singular lack of authority as to what act or series of acts will constitute a location.

The word "location" itself implies, we submit, the right to go upon the land, to construct the proposed rail-

way, and to operate it when completed.   It can scarcely be seriously contended that a railroad may be located on land over which the incorporators have no power, right, or control.

It will be seen, therefore, that one of the conditions precedent to a location, is the acquiring the right to the land, the seat of the supposed location.

Applying this principle to the case of the Odessa & Middletown railway, we find that complainant must utterly fail unless it is shown that this respondent company had a vested right in and to the land over which its first proposed route was to have run.

As a matter of fact, however, this was far from being the case.   By the very authorities quoted above, it will be clear that no such right did vest in this respondent company by anyone or by a combination of all of the acts of this company.

A survey, condemnation proceedings, the finding or award, all these, unless accompanied by a payment, tender, or deposit of the damages, will not amount to a location simply because none of those acts vested any right in the railroad company to locate their line.

It must certainly be admitted that no railroad company has the legal right to enter upon condemned lands until the condemnation money has been paid, tendered, or deposited.   The provisions both of the Federal and of the State Constitution are plain on this head.   If, then, there be, up to that point, no right of entry, how can there be a location?   If a location may be effected without a right to locate, then, and then only, can such a result be forced from the acts of this respondent company.

Let us take the language of the charter itself on this same point: "And the said freeholders, or a majority of them, shall certify their finding and award to both parties, whereupon the· said company, upon paying the damages so assessed, or depositing the same in New Castle County National Bank of Odessa, to the credit of said owner or owners, shall become entitled to have, use, and enjoy said lands and rights of way for the purposes of said company, forever. The expenses of the assessment of the said damages shall be paid by the said company."

Can there be any doubt as to the meaning of the words quoted? The payment, tender, or deposit of the damages· awarded is the condition precedent, expressly made such by the legislative grant, to the vesting of any right to the lands condemned in this respondent company.

Take the language of Chancellor Saulsbury, in the case of Wilson v. Baltimore & P. R. R. Co., 5 Del. Ch. 524, which is as follows: " The commissioners are authorized to render no judgment against the person or the thing. They assess damages. They make an award which binds nothing. No executions, or other process, can be issued thereon, and no proceedings can be taken under it, until the money is paid or deposited as the act prescribes."

Can words be clearer or stronger than these? The condemnation proceedings and the award itself gives no right on either side, and renders no liability. The company cannot go on the land; the landowners cannot sue for the sums awarded. The whole proceeding is nothing more than the fixing of the price for which the unwilling

landowner must sell his property if it be paid to him. After the award, the owner of condemned land is in precisely the same position to the railroad company as is any one of the owners of property who has bound himself to accept a certain stipulated price if the company proffers it.

The freeholders in condemnation proceedings are merely the umpires between two disagreeing classes. After they make their award, the disagreement as to the price is finally settled, but that is all. After the award, the two parties are perforce in the position of being reconciled as to the price of the land in dispute, but in no other way has their former position towards each other been changed.

In some of the States, the award becomes a judgment against the corporation. Such a provision in our law would unquestionably completely alter the status of the parties. If a judgment, then a liability is fixed, and a right conferred. Then the corporation would have an immediate right to the user of the land.

Such is not the case in this State.

Note the Pennsylvania statute on this subject. Brightly's Purdon's Dig. 1219, 1220.

Leaving out of consideration altogether the plain and express words of the charter of this respondent company, making the payment or deposit of the sum awarded the condition precedent to the vesting of right or title to the land, the provision of the Federal and the State Constitution requiring that private property shall not be taken except upon payment of the reasonable value of the same, it is quite clear that the Odessa & Middletown railway had no interest in the land covered by its

first proposed route. This being the case, the contention of the complainant would present the anomalous condition of a railroad located (technically at least) on lands of persons who have absolutely no connection with the road or the charter under which it is proposed.

Now, if the owners of the land condemned by the first set of freeholders had a legal claim against the company for the damages awarded them in the first inquisition, it might with some show of reason be contended that the provisions of the Federal and State Constitution had been complied with.

Such; however, is not the case. The words of the Chancellor, in the case of Wilson v. Baltimore & P. R. R. Co., 5 Del. Ch. 524, quoted above, show clearly that no such right did vest in those owners by reason of said inquisition.

In still further corroboration of this fact that no valid claim for the sums awarded vested in the landowners by reason of the inquisition and award, we cite the following cases in addition to those already cited; many of which are also directly on this point: Stacey v. Vermont Cent. R. R. Co., 27 Vt. 29; Chicago, Kan. & Western R. R. Co. v. Watkins, 43 Kan. 50.

The value in the present case of authorities settling this question will be at once apparent.

No case in the books can be found whereby it has been determined that acts which confer no powers or rights, or fix no correlative liabilities, will exhaust the power of eminent domain. In order to hold that any act or acts will work such an exhaustion, there must be a reason therefor; and that reason must lie in some result flowing from the things done. For example, it

has never, so far as we can learn, been held that a mere survey of a proposed route, independent of general or particular statutory provisions, will constitute a location so as to exhaust the power of further selection. A survey can have no such effect, simply because it fixes nothing on either side.

Now, if this be true with regard to the survey, why should a different result flow from the holding of the inquisition and the award thereon? Surely, only if something is fixed by those proceedings. As we have shown, however, such is not the case. The price is fixed, it is true, but that is all; and, as we have before stated, the fixing of the price in such a case is no more than if those landowners had bound themselves in any other manner to accept a certain price if the corporation would pay the same.

There being no reason, therefore, why the condemnation proceedings should have a different effect from the making of the survey, that different effect cannot be forced.

The holding that this respondent company had and has the right to select a route other than the first proposed can work no possible hardship. Its own charter renders it liable for the costs of the first inquisition, and the law is equally plain that any damages resulting to the landowners by reason of the first inquisition can be charged against it.

No principle of law of injunctions is more clearly established than that private persons, seeking the aid of equity to restrain a public nuisance, must show some special injury peculiar to themselves, aside from and independent of the general injury to the public. Even

in cases of unquestioned nuisance, if the party complaining shows no special injury to himself different from the common injury to the public, he is not entitled to an injunction. In accordance with these principles, where it is made to appear after injunction granted that the injury suffered by complainant is sustained by him in common with every taxpayer, and the damage, therefore, is not special or peculiar, the injunction will be dissolved. And where the injury is doubtful and the evidence conflicting, the relief will be withheld. High on Injunctions, 291; Harlan & Hol. Co. v. Paschall, 5 Del. Ch. 435; Biggs v. L. C. Co., 6 id. 267; O'Brien v. Nor. & Worcester R. R. Co., 17 Conn. 372; Bigelow v. Hartford Bridge Co., 14 id. 565; Dawson v. St. Paul, L. & M. Ins. Co., 15 Minn. 136.

\*WOLCOTT, CHANCELLOR.— The question involved is, has the Odessa & Middletown railway (after having a certain route for its proposed road surveyed, and condemnation proceedings instituted and damages assessed for certain lands along said route) the right to abandon this first route, to select another and different route running over a portion of the lands of the complainant, and to institute new condemnation proceedings on such altered route?

The statement of facts agreed upon, so far as it relates to the steps taken by the defendant company in connection with the first route selected for its road, contains the following:

---

\* The Chancellor had intended revising the following opinion in some particulars, but was prevented from doing so by death. This revision was not, however. to in anywise alter or modify the conclusions arrived at, or the principles of law there laid down. J. L. W., Jr.

" That the said defendant,  *   *   *   after numerous surveys, selected a route for the proposed railway and the line along which it intended to construct the same, provided the damages which might be assessed for the right of way when assessed did not exceed the amount which the said company felt able and willing to pay, and designated and staked out said line over the lands of those persons whose lands were crossed by its said proposed railway, drew plans and maps of the same for its own use showing the route, distance, widths, and grades of its proposed railway, and with the necessary data for its own use, and for the use of the commissioners and freeholders, who were afterwards called on to condemn certain portions thereof in viewing the lands to be condemned and ascertaining the damages to be awarded;  *   *   *

" Fourth. That said defendant company agreed with certain of the owners of the lands through, over, and across which its said line was staked out and designated as aforesaid, for the purchase of and obtaining the lands and rights of way necessary for the purposes of constructing the railroad provided for by the said act, and the use of the said railway, but, having been unable to agree with all the owners of the lands, through which its said proposed line was to be constructed for the purchase of such lands and rights of way as were required for its purposes and the purposes of the said act, on the 27th day of August, A. D. 1889, applied as required by the said act first mentioned to the chief justice of the State of Delaware to appoint five judicious and impartial freeholders of said New Castle County to view the premises," etc.

The appointment of the commissioners is recited, and the statement then proceeds as follows:

" Fifth. That the said freeholders so appointed duly and properly qualified themselves, elected said Henry A. Nowland their chairman, and as required by the said act, condemned said lands and rights of way through and over said disagreeing owners, and on or about the 15th day of October, A. D. 1889, assessed the damages of the said landowners with whom said defendant company was unable to agree, fixing the amount   *   *   * and notified said company of such awards, and the said company learning the amount of the said awards or assessments, declared that they, the said awards and assessments, were so large that the said company could not afford to pay the same, and that the said road or railway so selected could not be constructed by it, and none of the said amounts so assessed or awarded as damages have ever been paid, tendered, or deposited in the bank as required by said act.   The facts respecting the notification of the company, and the circumstances relating thereto being as follows:   Many or all of the landowners·whose lands were to be condemned for the use of the said defendant were notified of the day, hour, and place of the meeting of the commissioners or freeholders by William · R. Polk, representing  the company, in the name of the said commissioners, and then and there appeared some in person and some by their attorneys, the said respondent being represented by said William R. Polk, and after viewing the lands of the said owners, respectively, and hearing the statements and arguments of the attorneys, landowners, and said William R. Polk,

representing the company, and duly considering the same, the freeholders decided upon the awards aforesaid for the owners, respectively. And the said Nathaniel Williams, who had been made secretary of the said board, informed said William R. Polk that written notices of said award and the amounts thereof, should be given the landowners, respectively, and offered to furnish said Polk with a copy of a proper form in which said notices should be drawn, but said Polk, representing the said respondent, stated to the said Nathaniel Williams that it was no use to take the trouble of preparing and serving such notices, that the respondent could not pay the amounts awarded as damages by said freeholders or commissioners, as it had not enough money and the railroad could not be built on that line, and no one, either respondent or freeholders, gave or prepared any formal written notices of the awards to any of the landowners over whose lands said line was selected and to be constructed as aforesaid, and none of the said owners received the formal written notices provided for by said act, but all were present or represented, and had verbal notice of the amounts of respective awards as shown in the list appended to the bill of the said complainant, and so matters remained until the latter part of the year A. D. 1891, when the said company, without further grant or delegation to it of the right to exercise the right of eminent domain by the said General Assembly, applied the second time to his honor, the said chief justice, for the appointment of other freeholders as aforesaid to condemn lands and assess damages to owners along an entirely different route," etc.

Section 6 of the charter of this defendant company (Chap. 513, p. 561, vol. 14, Del. Laws) provides as follows:

." § 6. That the said company shall have power to survey, locate, and purchase such lands and rights of way within the limits of New Castle County as said company may deem necessary for this purpose, and in case said company shall be unable to agree with the owner or owners for the purchase of such lands or rights of way as may be required for the purpose of this act, the chief justice of the State of Delaware shall, upon the written application of the president of said company, appoint five judicious and impartial freeholders of said county to view the premises and assess the damages which the owner or owners will sustain by reason of the taking of the said lands and rights of way for the use of the said company. Before entering upon the premises, the said freeholders shall be sworn or affirmed, before some judge, justice of the peace, or notary public, faithfully and impartially to perform the duties assigned them, and they shall give five days' written notice to the occupant or owner of said premises, if within this State, and the same notice to the president of said company, of the time of their meeting upon said premises for the discharge of their duties; and the said freeholders, or a majority of them, shall certify their finding and award to both parties, whereupon the said company, upon paying the damages so assessed, or depositing the same in New Castle County National Bank of Odessa, to the credit of said owner or owners, shall become entitled to have, use, and enjoy said lands and rights of way for the purpose of said company forever. The expenses of

the assessment of the said damages shall be paid by said company."

The contention of solicitor for complainant resolves itself into two propositions, by which alone his argument must stand or fall.

First. That the facts agreed upon constitute a " location," on the part of this defendant company, of their proposed road along and on the route so by them first selected; and,

Second. That the effect of a " location " is an absolute and total exhaustion of the power of eminent domain conferred by its charter and supplements.

Undoubtedly, a substantiation of these two propositions will make good the case of the complainant. On the other hand, however, it must be noted that the second is, in effect, a consequence flowing from and dependent upon the truth of the first. If, therefore, the first of these propositions be not clearly demonstrated, it will be entirely unnecessary to consider the second; for it is upon these two propositions taken together, and not singly, that complainant's case must rest.

In taking up the first of these propositions, I shall, at the outset, consider it in the light of reason, independent of any authorities or precedents, reserving the consideration of these latter for another portion of this opinion.

The facts relied upon as constituting a location are those regarding the inquisition and the assessment of the damages for certain lands along the route first selected. It is proper then to inquire why and how these particular facts should have such an effect.

It is quite certain that every act that was, or might have been, done by the Odessa & Middletown Railway

22

did not, or would not, have produced such a result. For example, it is·not contended that the survey alone amounted to a location.

It would seem to follow, therefore, that the act or set of acts which will constitute a location in the sense claimed must fix some right or establish some liability between the parties thereto. There can be no other reasonable ground for drawing such an effect from one or a series of acts, and not from another.

Does the inquisition, then, and the assessment of damages establish a right and a liability?

I take it to be the settled law of this State that the condemnation proceedings alone establish nothing, vest nothing, and fix nothing, except only the price at which the land inquired upon may be had from the proprietor by the corporation. It is true that the corporation may, after the inquisition, simply pay or deposit the price so fixed, and immediately the land becomes its property, with or without the consent of the owner; but this vesting of the title to the land by the mere payment or deposit of the damages assessed is not a result or consequence of the inquisition, but of the charter itself, for this is the power of eminent domain.

This distinction must be clearly and distinctly understood or confusion and sophistry will follow.

The effect of an inquisition in Delaware is reduced then to this, that it fixes the price at which the land may be had, nothing less and nothing more.

No right can be said to be vested, for the only right that exists (that of taking the land on payment or deposit) is, as I have said, the direct result of the legislative statute. Neither does the finding of the commis-

sioners fix any liability. If any such were fixed, it would be, of necessity, the liability of the corporation to be sued by the proprietors and have judgment recovered against it for the assessed damages; but solicitor for complainant expressly removes this point from the case by insisting that his contention does not, in the least, involve such a liability.

What reasons then can be adduced for giving to so barren an act such a violent and far-reaching effect as to totally preclude the corporation from acting further under its charter in the selection of a route?

It was strenuously urged at the hearing that matters of public policy alone would be sufficient to cause such an effect; that otherwise, inquisitions might, and probably would, be indulged in *ad libitum* by corporations, for the sole purpose of " chaffering " with landowners for the cheapest route; and that the owners themselves would be oppressed by having their lands hung up in uncertainty, improvements stopped, at least temporarily, and themselves dragged into the expense and annoyance of attending the inquisition.

This plea can be briefly answered by stating that even if the liability of the corporation for all costs incurred in each condemnation proceeding which it abandons were not a sufficient safeguard against mere capricious bargaining, then certainly its other and further liability for all damages and expenses reasonably incurred by the landowners by reason of the inquisition would be a sufficiently strong and high one. The fact that such a liability on the part of the corporation abandoning an award does exist will, I think, be conclusively shown by

the authorities hereafter considered, if it be questioned at all.

I know that it is urged that grants of eminent domain must be strictly construed against the grantee.

This principle is too well settled to admit of questioning. Eminent domain is a power so closely akin to sovereignty that, in a country such as ours, there is always a present necessity for its most careful and vigilant guardianship, although it is submitted that close vigil should be maintained rather in the legislative halls than in the tribunals of the courts.

Admitting this principle, however, in all its force and vigor, it nevertheless does not and should not entail an interpretation which seizes upon meaningless excuses and makeshifts with which to exterminate the power given by the people themselves through their immediate representatives.

Why was the power of eminent domain permitted to be delegated, since it might so easily have been entirely withheld? Simply because it is recognized, well-nigh universally, that its delegation is conducive and necessary to the public good.

Take, for example, any railway corporation, such as this defendant company. The grant of eminent domain, it will not be contended, was made to it simply that the private individuals who make up its organization might profit thereby. The power and the grant itself were conferred because the public were known to have a vital concern in the project for which the corporation was designed.

This being true, it follows that every senseless interpretation which virtually annihilates the power con-

ferred is an obstacle in the path of public improvement and inimical to the public interest and well being.

The people, by their Constitution, have made the General Assembly the sole judges of the wisdom or utility of conferring upon corporations this high power, and, therefore, every charter which comes to our courts for construction comes sealed with the seal of popular approval and conclusively vouched for as a matter of public good and public importance.

I have dwelt thus at length upon the interpretation of the principle of law contended for, not as reflecting on or questioning its authority, which I have expressly admitted, but simply to show that it cannot be employed causelessly.

Returning now to the effect of the condemnation proceedings, and assuming that I have shown that the effect is nothing more than if the landowners themselves had bound themselves to take a certain price for their property if the same were paid or deposited to their order, I can see no sound reason for holding that the inquisition amounted to a location.

I shall proceed now to consider the authorities produced upon both sides to see how far they harmonize, or are discordant, with the opinion expressed.

It will, of course, be noted that only those authorities where the statutes and charters are analogous, on the main points involved in this controversy, with those in our own State, can be of any relevancy. I have, therefore, spared no pains to investigate the laws of those States from which cases have been cited, so far as they lay in my command.

An examination of the public statutes of Pennsylvania will demonstrate the inapplicability of cases arising in that State after the survey of a proposed railway route by the viewers, as they are called, to the case in hand.

The powers and limitations of the Odessa & Middletown railway are to be found within the four corners of its charter and the supplemental act thereto, and only there. The cases in Pennsylvania, on the other hand, are controlled by the general statute regulating the construction of railroads. By the terms of the charter of the corporation before me, the action of the commissioners appointed to lay out a route for the company binds no one until the damages assessed by them are paid or deposited by the company. In Pennsylvania, no payment or deposit is made a condition precedent, but the action of the viewers alone becomes, when confirmed by the court, a judgment exactly like a judgment in case of a debt, and execution may issue upon it in precisely the same manner. With such a difference between the laws, it can hardly be insisted seriously that any analogy can be drawn.

The language of the Pennsylvania statute is as follows:

" § 35. When the said company " (railroad) " cannot agree with the owner or owners of any lands or material for the compensation proper for the damage done, or likely to be done, to or sustained by any such owner or owners of such lands or materials, which such company may enter upon, use, or take away, in pursuance of the authority hereinbefore given, or by reason of the absence or legal incapacity of such owner or own-

ers, no such compensation can be agreed upon, the court of common pleas of the proper county, on application thereto by petition either by said company, or owner or owners, or anyone in behalf of either, shall appoint seven discreet and disinterested freeholders of said county, neither of whom shall be residents or owners of property upon or adjoining the line of such railroad, and appoint a time not less than twenty nor more than thirty days thereafter, for said viewers to meet at or upon the premises where the damages are alleged to be sustained, of which time and place ten days' notice shall be given by the petitioner to the said viewers and the other party; and the said viewers, or any five of them, having been first duly sworn or affirmed faithfully, justly, and impartially to decide, and true report to make concerning all matters and things to be submitted to them, and in relation to which they are authorized to inquire in pursuance of the provisions of this act, and having viewed the premises, they shall estimate and determine the quantity, quality, and value of said lands so taken or occupied, or to be so taken or occupied, or the materials so used or taken away, as the case may be, and having a due regard to, and making just allowance for the advantages which may have resulted, or which may seem likely to result to the owner or owners of said lands or materials, in consequence of the making or opening of said railroad, and of the construction of works connected therewith; and after having made a fair and just comparison of said advantages and disadvantages, they shall determine and estimate whether any, and if any, what amount of damages has been or may be sustained, and to whom payable, and make report

thereof to said court; and if any damages be awarded, and the report be confirmed by the said court, judgment shall be entered thereon; and if the amount thereof be not paid within thirty days after the entry of such judgment, execution may then issue thereon, as in other cases of debt, for the sum so awarded, and the costs and expenses incurred shall be defrayed by the said railroad." Brightly's Purdon's Dig. 1219, 1220, Act Feb. 19, 1849.

The sanctity thus given to the report of the viewers, when confirmed, in making it a judgment, is expressly noted in the case of Neal et al. v. Pittsburgh & Connellsville R. R. Co., 2 Grant's Cas. (Penn.) 137, cited by solicitor for complainant.

The facts in this case are as follows:

On the 28th day of June, 1854, the defendants in error presented their petition to the Court of Common Pleas of Allegheny County, in proper form, with the proper allegations, accompanied by the proper diagram, and prayed for the appointment of viewers to assess the damages, *inter alia,* upon the lands of plaintiffs in error. Viewers were appointed, performed their duties, made their report, awarding the plaintiffs in error $1,500, which report was confirmed, and judgment entered thereon December 23, 1854. *Fi. fa.* was issued to December Term, 1854, and returned *nulla bona. Alias fi. fa.* was issued to March Term, 1855, and levy made on personal property of defendants. January 9, 1855, at the instance of defendants, a rule was granted to show cause why the *alias fi. fa.* should not be set aside for the reasons, substantially, that the railroad company had not entered upon the said lands or signi-

fied their intention so to do, and because they in fact did not intend to take the said lands, but to select another route than that so laid out.

Lowrie, J., in delivering the opinion of the court, said:

" When they " (the damages) " have been ascertained by report and judgment thereon, the judgment settles the right of the landowner to such damages, just as completely as any other judgment, and he has just the same right to execution upon it. He is not to wait until the company say they are ready to go on, else all improvements by the owners of property along such a route must be indefinitely suspended upon a contingent appropriation. If judgments are to be the end of strife, they must bind both parties; and the power of taking any man's land is exhausted by a location which it is too weak to retain; it cannot be indulged with another choice.

" Here the petition to settle the damages is filed by the company, and they say that they have located their road over the land for which these damages are assessed. A report having been made and judgment entered thereon, it is a final judgment, entitling the party to execution. If the company have any equitable ground of relief, they must present it in some other form than a mere motion to set aside a regular execution."

By comparing the language of the charter of this defendant company with that of the Pennsylvania statute, the difference in effect between the report of the commissioners in the one and of the viewers in the other case is significantly apparent.

Section 6 of the charter of the Odessa & Middletown railway (Vol. 14, Del. Laws, 561) is as follows:

" § 6. That the said company shall have power to survey, locate, and purchase such lands and rights of way within the limits of New Castle County as said company may deem necessary for their purpose, and in case said company shall be unable to agree with the owner or owners for the purchase of such lands or rights of way as may be required for the purpose of this act, the chief justice of the State of Delaware shall, upon the written application of the president of said company, appoint five judicious and impartial freeholders of said county to view the premises and assess the damages which the owner or owners will sustain by reason of the taking of the said lands and rights of way for the use of said company. Before entering upon the premises, the said freeholders shall be sworn or affirmed, before some judge, justice of the peace, or notary public, faithfully and impartially to perform the duty assigned them, and they shall give five days' written notice to the occupants or owner of said premises, if within this State, and the same notice to the president of said company, of the time of their meeting upon the premises for the discharge of their duties; and the said freeholders, or a majority of them, shall certify their finding and award to both parties, whereupon the said company, on paying the damages so assessed, or depositing the same in New Castle County National Bank of Odessa, to the credit of said owner or owners, shall become entitled to have, use, and enjoy said lands and rights of way for the purpose of said company forever."

It will be noted that no provision is made herein for the return of the proceedings or finding of said commissioners to the court, nor any confirmation thereof. The Pennsylvania statute makes the finding of damages by the viewers, when confirmed, a judgment of the court in favor of the owner of the land. But there could not be a judgment for the amount of the damages assessed unless the title to the land became vested by the return and confirmation in the railroad company. In short, the vesting of the title to the land is the consideration of the judgment. In the charter of this defendant company, a condition precedent to the vesting of the title is expressly made, and a condition moreover which the company itself is to perform, namely, the payment or deposit of the damages so assessed. In the one case, the vesting of the title is immediate and independent of any action of the railroad; in the other, no right vests without a payment or deposit. Until the Odessa & Middletown railway had made the payment or assessment, an entry by them upon the lands of this complainant would have rendered them liable as trespassers.

If other authority than the express words of the charter of this defendant company were required to demonstrate the radical difference between the effect of an inquisition and award in the State of Pennsylvania and in Delaware, it could be abundantly had in the ruling of the late Chancellor Saulsbury in the case of Wilson v. Baltimore & P. R. R. Co., 5 Del. Ch. 524.

On page 542 of the opinion, the Chancellor say " The commissioners are authorized to render no judgment either against the person or the thing. They assess damages. They make an award which binds

nothing. No execution or process can be issued thereon, and no proceedings can be taken under it until the money is paid or deposited as the act prescribes."

Both by the facts and the principles of law laid down in the opinions of the court, the two remaining cases cited by the solicitor for the complainant from Pennsylvania are substantially differentiated from the cause now under consideration.

In McMurtrie v. Stewart, 21 Penn. St. 325, Black, Ch. J., says:

" This was trespass for entering plaintiff's field, taking down his fences and injuring his crops. The defense is that one of the parties sued was supervisor of the township where the alleged injury was done, and went there himself, taking two of the others along as assistants, for the lawful purpose of opening a public road laid out by order of the Court of Quarter Sessions. The plaintiffs in error have furnished us a few meagre extracts from the evidence. But from these, and from the facts stated in the charge, we infer that the road in question was laid out many years ago (how many we cannot tell), and that it was opened at least seven years before the time when the wrong complained of in this suit was committed. From 1837 to 1844, the road was used and kept in repair by the public. But it is now asserted that it was opened on the wrong ground — that the location agreed on by the viewers was through the plaintiff's field, whereas the supervisors of 1844, when they opened it, carried it around the field by way of a private road, which had been previously used. It was under pretense of correcting this error that the defendants entered on the plaintiff's land."

Under such a statement of facts, it can scarcely be a matter of surprise that the learned judge decided that the supervisor defendant had long since exhausted his authority as to the laying out of the road, and was a mere trespasser in his subsequent action.    To attempt to force an analogy between this case and the one now before me would be to willfully ignore the striking difference between the mere survey of a route, and a survey with an actual user for many years.

But the following extract from the opinion of the court will still further demonstrate the inapplicability of the McMurtrie case to that of the Odessa & Middletown railway.    " Besides, one who is really aggrieved by the opening of a road on ground not intended by the viewers, may have it altered by a petition to the court, and the appointment of new viewers."    Page 326 of the opinion.

Here is an express ruling of the court as to what is intended by the statement that the location of the road exhausts the power to relocate or alter.    The exhaustion of such a power is confined to the set of supervisors who first acted, and the court positively asserts the right to a new petition and the appointment of new viewers and supervisors who would have the power of relocation and alteration.

If this defendant company based its claims to a change of route upon a subsequent action of the first commissioners, there might be a point of similarity in the two cases.    As a matter of fact, however, it did present a new petition to the chief justice, and new commissioners were appointed.

The case of Morrow v. Commonwealth, 48 Penn. St. 305, is a case in which the facts are substantially similar to those in McMurtrie v. Stewart, and the ruling of the court in the former goes no further than in the latter.

In the case of Blakemore v. Glamorganshire Canal Navigation Co., 1 Myl. & K. 154, the main question in dispute was whether the defendant, who had been authorized to construct a canal, the dimensions of which were not specified, could, after the canal had been completed, of a certain width, widen the same.

Lord Eldon, in the course of his opinion, said:

" But, if that is done, and the canal is completed in the sense which the act of Parliament means by the word *completed*, and the sense put upon the word by these defendants themselves (as is shown by their going about to levy their tolls on the whole course of the canal), and if, notwithstanding, they may afterwards widen and deepen the canal, what is there to hinder them from carrying it from sea to sea? Why, there would be no end of it. When the canal is completed, the powers of the company are exhausted, and in making the canal, the proprietors are not at liberty afterwards to injure the interest of parties by making what is quite a different canal."

This reasoning of Lord Edon, which is certainly most pertinent and cogent in the cause before him, would lose all of its force and application if it had been uttered under a statement of facts like that which has arisen in the matter now before me.

As a matter of fact, however, no English case can be taken as authority in this State, simply because the method of procedure in the taking of lands for public

or *quasi* public purposes differs materially from that in Delaware.

In England, the particular route is set forth by metes and bounds, courses and distances, at the time of the application to Parliament for the charter. The charter is then granted for that particular route. This difference alone would render the English cases inapplicable, since it is not contended, but that the specification in the charter of the exact route proposed would definitively limit the corporate power of eminent domain conferred by that instrument.

The difference does not, however, stop even here. After the charter is granted, notice is given to the property-owners along such route; with an offer of a price; this offer is accepted or refused with a counter offer; a jury then tries the question of price, and their verdict is registered as a conveyance of the title to the land in question.

In the case of Morris & Essex R. R. Co. v. Central R. R. Co. of New Jersey, 31 N. J. L. 205, the facts were as follows:

The defendant for many years, and prior to the location of the plaintiff company at Phillipsburgh, owned a railroad beginning at Elizabethport, and extending to the Delaware river, at Phillipsburgh. On the 29th of May, 1860, the plaintiff filed a survey in the office of the secretary of state of New Jersey, under their charter and its supplements of a route for the extension of their railroad from Hackettstown to the Delaware river, and in December, 1863, they purchased certain lands in Phillipsburgh on the line of said route and adjoining lands of the defendant, upon which, as early as the

1st of April, 1864, they constructed the roadbed of their said railroad. Afterwards, on the 24th of March, 1864, the defendant filed in the office of the secretary of state a survey or location of a part of the Central railroad in the village of Phillipsburgh, the route of which survey crossed the before-mentioned location of the extension of the plaintiff's line. Subsequently the defendant presented a petition for the appointment of commissioners to examine and appraise the land so by them intended to be taken from the Morris & Essex Railroad Company, and to assess the damages sustained by the latter company by taking said land.

The petition was resisted on the ground that the Central Railroad Company had long since constructed and entirely completed their road and had continued in operation over it for some time, and that the only object of the petition was to build a branch or spur to the line so already laid out and constructed. The court held that they had no right to do this on the ground that the former construction and operation over the other route or roadbed exhausted their power to locate a line without another grant of the right of eminent domain.

In the case of the State of Connecticut v. The Norwalk & Danbury Turnpike Co., 10 Conn. 157, a recital of the facts, as set forth in the brief of the solicitor for the complainant, will of itself effectually reveal the absence of any analogy to the cause in hand.

The Legislature, in the charter for a turnpike company, empowered the proprietors to erect and establish a toll-gate on their road in the most convenient place, to be by them determined. In 1796, about a year after the grant, they erected and established a gate at a cer-

tain place on the southerly portion of their road, that being determined by them to be the most convenient place.    It was removed afterwards from time to time, and place to place, until it was located, in November, 1831, at a certain point on the northerly portion of their road.    In May, 1832, the Legislature incorporated another turnpike company on the petition of the proprietors whose road intersected the northerly portion of the first-mentioned road, between the last location of the gate.    In the charter of this company, it was proved, that the first-mentioned company should not thereafter maintain a gate on their road southerly of said point of intersection; but that they should have the right at all times to maintain a gate on their road at any place southerly of said point of intersection, agreeable to the terms of their original charter.

On an information in the nature of a *quo warranto,* filed in December, 1831, and continued until 1833, complaining of the location of the gate in 1831, it was held that the erection and construction of the toll-gate at the point first selected by the company was an exhaustion of their power to erect and construct under their charter.

The opinion of the court in that case goes no further than this ruling of a certainly well-established principle of law.    It can hardly be thought necessary to point out particularly the difference between the ruling in this case and the one before me, where no construction or user has ever existed.

The case of The Hartford, New London, Windham & Tolland County Society for Establishing a Turnpike Road from the City of Hartford to the City of Norwich

23

v. Hosmer, 12 Conn. 360, arose under a state of facts substantially like that presented in the case in 10 Conn., just referred to.    Here, also, there had been an erection, construction and user of a toll-gate at one point, and a subsequent attempt to change to another point.

The court make practically the same ruling as in the former case, that the first erection, construction and user worked an exhaustion of their power under the charter.

The case of Morehead et al. v. The Little Miami R. R. Co., 17 Ohio St. 340, may be disposed of by simply stating that the ground of that suit was an effort to relocate a line of railway after a construction and operation of over five years over another route; and that there is no ruling in the opinion of the court hinting, either directly or inferentially, at a state of facts like that now under consideration.

The case of The Little Miami R. R. Co. v. Naylor, 2 Ohio St. 235, may be disposed of in a few words, so far as this cause is concerned, by stating that the sole question before the court was as to the right of a railroad company, already constructed and in operation, to change its tracks to another portion of a public street. The term " location," as used in this opinion, refers particularly and exclusively to a location caused by an actual construction.    In fact, the court goes so far in the opposite direction from that for which it was presumably cited by complainant's solicitor, as to make a distinction between the change of a route *before* construction, and a change *after* construction, and to call the former merely a " change of selection," while the latter only is designated as a change of " location."

In the case of Brock v. Old Colony R. R. Co., 146 Mass. 194, a recital of the facts causing the controversy, together with a few quotations from the charter of the defendant, and from the general statutes of Massachusetts, will conclusively demonstrate its inapplicability to this cause.

The facts are as follows:

Writ of entry, dated October 1st, 1886, to recover a parcel of land in Stoughton.

The facts agreed on were, in substance;

On September 27th, 1854, the plaintiff owned a tract of land in Stoughton, which was bounded on its easterly side by land of O. Ames & Son.  The Easton Branch R. R. Co., to whose rights and liabilities the tenant has succeeded, was incorporated by the statutes of 1854, chapter 55, and on September 27th, 1854, filed the location of its road in the office of the County Commissioners of the County of Norfolk.  A plan accompanied, and was made a part of the location.  By such location and plan, the demandant's name did not appear as one of the persons whose land was taken in and by the location, though the name of O. Ames & Son did so appear; but by an application of the monuments, boundaries, courses, and distances given in the plan and location to the land itself, it appeared that the demanded premises were included in the location.

The Easton Branch R. R. Co. afterwards constructed its road over the land described in its location, but did not before doing so furnish the demandant with a plan of his land included in its said location, nor did the plaintiff request such a plan.  The Easton Branch R. R. Co., or the tenant, did not fence or enter into actual

occupation of the demanded premises until the year 1879 (seven years before the date of the writ of entry), since which time the tenant has been in actual occupation against the objection of the demandant, who up to that time had no actual knowledge that any of his land was included in the location, nor any notice of that fact, except such as was given by the filing of the location.        The demandant has never parted with his title to the demanded premises, except as herein stated, nor did the Easton Branch R. R. Co., or the tenant, ever pay the plaintiff any damages or compensation for the taking of his land.

By the charter of the E. B. R. R. Co., the assignor of the tenant (Acts and Resolves of Massachusetts, passed in 1854, chap. 55), the corporation is expressly made subject to the restrictions and provisions set forth " in the thirty-ninth chapter of said " (revised) " statutes, relating to railroad corporations."

Sections 46, 47 and 48 of said chapter 39 are as follows:

" § 46. No petition for the establishment of any railroad corporation shall be acted upon, unless the same is accompanied and supported by the report of a skillful engineer, founded on actual examination of the route, and by other proper evidence, showing the character of the soil, the manner in which it is proposed to construct such railroad, the general profile of the surface of the country through which it is proposed to be made, the feasibility of the route, and an estimate of the probable expense of constructing the same."

" § 47. No such petition shall be acted upon, until notice of the pendency thereof shall have been pub-

lished according to law, which notice shall designate the intended route with such certainty as to give reasonable notice to all persons interested therein, that their rights may be affected by the granting of said petition, and that they may have an opportunity to appear and object thereto; but the provisions of this and the preceding sections shall not prevent the Legislature from requiring surveys, plans, and further estimates in any case, when they shall judge proper."

" § 48. *Every act of incorporation for a railroad company shall confine the road within the limits, indicated by the notice required in the preceding sections,* shall specify the several towns through which the same may pass, and shall otherwise designate the route, on which the road may be authorized to be made, with as much certainty as the nature of each case will admit."

In section 5 of the charter above referred to, it is further provided that:

" If the *location* of the road as provided for in the second section, be not *filed* according to law, within one year, and if said railroad be not completed within three years from the passage of this act, then this act shall be void."

In section 75 of chapter 39 of the general statutes referred to above, it is stipulated that:

" § 75. Every railroad corporation shall, in all cases, file the location of their road within one year with the commissioners of each county through which the same passes, defining the courses, distances, and boundaries of such portion thereof, as lies within each county, respectively."

Here again it will be seen that we are presented with a case where the company is bound by law to indicate its particular route and to file the same in certain public offices before it can take one step towards the consummation of its design. This indication of the route and the filing thereof is expressly made its location by positive *legislative* enactments. It is made as much a part of its charter as if that instrument had set forth the route specifically and particularly by boundaries, courses and distances.

The entire absence of any such statutory or charter provisions in the case of the Odessa & Middletown Railway breaks down every point of analogy which otherwise might have existed between it and the case cited.

In the case of Brigham v. The Agricultural Branch R. R. Co., 1 Allen (Mass.), 316, there is some ambiguity in the statement of facts which lends a doubt as to the application of some portions of the ruling of the court.

The general facts as stated were, that the defendant, by its act of incorporation, was authorized to construct its line from a point in the Village of Northborough to one in that of Southborough; this line, however, to pass to the northward of the lands of Willard Newton and at a point in the southerly portion of the Village of Marlborough; thus limiting the general bearing of the route. In the location of its line, the defendants first went in a direction which would have brought them to the south instead of to the north of Newton's land, but attempted to bring their road within the provisions of the charter by making a wide curve, which brought them to the north of the land, from which the road, by an acute

angle, was continued to Southborough.    Afterwards, a spur was constructed northerly from the point of this angle to the Village of Marlborough, a distance of about a mile and one-half, passing over the land of the plaintiff.

The court, on page 318 of the opinion, say in reference to this spur or extension:

" This extension was, after the junction of the tracks upon the land of Newton, wholly unnecessary to perfect the line of travel and transportation between Northborough and Southborough, and must consequently be considered as having been made without any authority whatever."

The court decided the " extension " of the road over plaintiff's land to be illegal.    The irresistible inference from the facts and various portions of the opinion is that the grounds of this decision were:

1st. Because that " extension " was made *after* a road, constituting a complete route or line between the points of commencement and termination, as set forth in the charter, had already been constructed; and,—

2d. Because the road so already constructed covered the real purpose and design of the act of incorporation, and the " extension " over plaintiff's land would be in the nature of an unauthorized addition to an already complete route between the termini specified in the charter.

The remarks of the court in this case, therefore, to the effect that a location once made exhausts the power in the company to a choice of routes, must be taken as applying to a state of facts analogous to that before it, and hence are clearly inapplicable to the present cause.

It is difficult to conceive how any ruling of the court in the case of the Boston & Providence Railroad Corporation v. Midland R. R. Co. and others, 1 Gray (Mass.), p. 340, can affect the decision of this cause at bar. The facts therein, and the opinion of the court thereon, involve simply and solely the interpretation of certain sections of the General Railway Statutes of Massachusetts, for which there are absolutely no counterparts in this State, and no *dictum* of the court can, with any show of reason, be distorted into a general principle independent of the existence of the peculiar and particular provisions of those general statutes.

The Revised Statutes of Massachusetts, chapter 39, section 75, provides that:

" Every railroad corporation shall, in all cases, file the location of their road within one year, with the commissioners of each county through which the same passes, defining the courses, distances and boundaries of such portions thereof, as lies within each county respectively."

. The defendant company had obtained a charter from the Legislature, in which its proposed line was not described with any more particularity than that it should be laid between two points or termini. Subsequently, however, and acting in accordance with the provisions of the section quoted above, it filed a map of its proposed road (which the statute expressly calls a " location "), describing its course specifically and definitely. Still later, and before the actual construction of the road-bed, the defendant company filed a new map under the title of " an amended location," with the proper county

commissioner, by which the route of its railway was altered materially, although the termini remained as fixed in its charter.

The main question considered by the court was, whether such alteration was legal.

Revised Statutes, chapter 39, section 73, provides that:

"Any railroad corporation, *after having taken lands* for any portion of their road, may, if they shall find it expedient, vary the direction of the road in the place where such land is situated; provided, they shall not thereby locate their road, or any part thereof, without the limits prescribed by their act of incorporation; and they shall, before the time required by law for completing their road, file the location of the different parts of the road, where such variations are made, with the commissioners of the respective counties, where said parts of the road are situated, or with the mayor and aldermen of the City of Boston, as the case may be; and provided, also, that the time allowed for completing the whole road, shall not be extended in consequence of such variation."

The court proceeds to interpret these two sections together, and concludes that the intent of the whole act is that the filing of the map or " location " is, in effect and actually, a taking of the land by the corporation such as estops the private owner from denying its title thereto, and which gives the former owner a right to recover from such corporation the damages for, or value of such land so constructively taken.

It is to be conjectured that counsel for complainant in the cause before me, relied upon this ruling as hav-

ing such general bearing on railroad companies, outside as well as within the State of Massachusetts, as to make the action of the Middletown & Odessa Company in the appointment of commissioners and their assessment of damages, of like reach and effect.

It is, however, upon the peculiar phraseology of various portions of the Massachusetts statutes, and particularly the words which I have italicized in the quotation from section 73 thereof ("after having taken lands"), that the opinion in Gray on this point is exclusively based. Nowhere can ingenuity discover even a hint that such a ruling would have prevailed in the absence of express legislative intent. On the contrary, the court even refer to another portion of the act which specifically confers upon the individual owners of land both on the original and altered route, the right to recover damages for the constructive, or the actual taking.

The opinion concludes by upholding the right of the defendant company to alter its course, but, basing this decision upon the express legislative right of such alteration.

In the case of Kenton County Court v. Bank Lick Turnpike Co., 10 Bush (Ky.), 529, a mere quotation from the first part of the opinion, containing a statement of the facts, will easily reveal its inapplicability to the cause now under consideration.

On page 531, the court say:

"The Bank Lick Turnpike Company was incorporated by act of assembly, approved February 6, 1839, with authority to construct a road between certain designated points, and to hold, use, possess, and occupy all such real and personal estate as might be necessary and

convenient for the site or route of said road."    *    *    *
" Under this charter, the company selected a route for
its road, acquired the right of way, and constructed the
road and opened it to public use, and continued to main-
tain and keep it in repair, and to collect toll for many
years."

The turnpike company afterwards abandoned a cer-
tain portion of its road to a railway, upon payment of
a money consideration by the latter, and a deed of
another piece of ground.

The court, on page 535, say:

" We think it equally clear that unless the amend-
ment in question has been accepted, the company had no
authority voluntarily to change the location of its road,
as was done in this case, and then to charge toll under
its original charter for the use of the new road.   Hav-
ing once exercised its choice, in the location of its road,
it was bound to keep the road as thus located in repair,
unless prevented by some *vis major*, or by the lawful
appropriation of its road, or a part of it, by the public."

Not only, beyond question, must the term " location,"
as used, have been intended to apply solely to the facts
before the court — an actual construction and operation
for many years — but also to the peculiar case of a turn-
pike company which has abandoned and failed to keep
in repair for a year a part of its road, and then strives
to collect toll under its old charter over a new piece of
ground.

In the case of The People v. New York & Harlem
R. R. Co., 45 Barb. 73, also cited by solicitor for com-
plainant, there is even less of similarity between the

facts considered and those giving rise to the cause before me.

The defendant had been given the right, by legislative enactment, to build a single or double track on certain streets and between certain points. A subsequent statute gave it the right " to extend " its course. The defendant did, in fact, build its road in accordance with its powers under the first act, and proceeded to operate its cars upon the line so laid out. Afterwards, it attempted to build other tracks, not as extensions, but as branches of its original line, and to operate them not instead of, but in connection with, its first line.

The whole question was as to the construction of the amendatory statute, and especially with regard to the word " extend," as used in that act. The court held that " to extend," meant to continue or prolong its course, and not to build independent branch roads.

It will be seen, therefore, how great is the dissimilarity between the facts in the 45 Barb. case and those now before me. In the former, the attempt was to build a distinct road in connection with one already constructed and operated; in the latter, there has been no construction, no operation, and no effort to acquire the right to the user of more than one road.

The solicitor for the complainant lays down the principle that:

" The power of eminent domain delegated by a legislative enactment, is exhausted after one exercise."

In support of this proposition, he cites, among others, the case of Brooklyn Central R. R. Co. v. Brooklyn City R. R. Co., 32 Barb. 358.

If it is desired to bring the Odessa & Middletown railway within the meaning and effect of the proposition quoted, it is incumbent on the complainant to show that the action taken by that company, as set forth in the statement of facts agreed upon, did amount to an exercise of the right of eminent domain. Yet certain it is that neither from the facts nor from any of the rulings of the court can any points of similarity be drawn from the case in 32 Barb. to that of the Odessa & Middletown railway.

The facts in the case cited are substantially as follows:

The defendant had acquired a charter permitting it to use certain streets for the construction of its road upon obtaining the consent of the common council. This consent it did obtain, with certain conditions annexed, such as paving the streets at certain portions, building bridges, etc. It complied with these conditions at the expense of large sums of money.

The plaintiff claimed the right to the use of the tracks of the defendant on a certain street, because it was the assignee of the franchise of the Brooklyn-Jamaica Company, which latter company, it claimed, had such a right.

The Jamaica Company was incorporated by an act of the Legislature, passed April 25th, 1832, with the right to construct a railroad, commencing at an eligible point within the Village of Brooklyn, and extending to any point within the Village of Jamaica, with lateral railways to the Villages of Flatbush and Flushing. The grant was not to commence at several points, but at one point in Brooklyn. It was not to ramify itself through

the several streets of the city at any or all times there-
after, but to run from the one point direct to another
point in the Village of Jamaica.    The company accord-
ingly located its western terminus at the foot of At-
lantic street, and its eastern in the Village of Jamaica,
where they have ever since remained.

It never had used the street which formed the bone
of contention in the case, but had laid its tracks on other
streets, and had for a number of years operated its cars
on the tracks so laid out.

Under these facts, the court ruled that:

" Having made its location, and adhered to it for
many years, it is concluded by what has been done."
Pages 365, 366 of the opinion.

The above quotation comprises the complete ruling
of the court upon the subject of location and the ex-
haustion of the power of eminent domain.    It will thus
be seen that the opinion goes no further than deciding
that the actual construction of a railway, and its opera-
tion as such for many years, is a location and an ex-
haustion of the power to alter or change its route.

In the case of Mason v. Brooklyn City & Newton R.
R. Co., 35 Barb. 373, the solicitor for the complainant
only quoted certain extracts from the opinion of the
court, to be found on page 381.    The quotation is as
follows:

" It is undoubtedly true, as contended by the learned
counsel, that when a corporation chartered for the pur-
pose of constructing a railway, has located its line, it
cannot change the location and adopt a new route, un-
less the power to do so is expressly granted in its char-
ter, and then only in the manner indicated.    This is

upon the plain principle that when the power thus conferred upon a company has once been exercised, it is exhausted. When authority is given to locate and construct a road, upon a route to be indicated in a certain manner, that route, when thus indicated, is in effect incorporated in the charter — as if the authority thus conferred were expressly and distinctly confined to the precise route laid down in the subsequent proceedings of the company — and the powers of the company are as finally and effectually limited to that precise line of road, as if such were the express provision of the charter."

I have quoted thus at length in order that every line and word of the opinion which can possibly be strained to have any bearing upon the point contended for by the solicitor, may be clearly and fully brought up. There is no other portion of the opinion which even hints in this direction.

If the language quoted is analyzed, it will be found that its denial of the power of a company to change a proposed route is expressly limited to two classes of cases:

1st. When it has *located* its road; and,

2d. When, by the terms of the general statute, or by its charter, authority is given to a company to locate and construct its road *upon a route first to be indicated in a certain manner by the company.*

Now, as to the first class of examples thus laid down, it is only necessary to say that their applicability to the case under consideration hinges solely and entirely upon the meaning of the word "location," which word is not defined by the court.

If, by the steps taken by the Odessa & Middletown Railway, that company has indeed located its road in the strictly technical intendment of the term, this *obiter dictum* (for it is nothing more). may be said to apply; but without a demonstration of such location by this defendant company, *it certainly cannot.*

The second class of examples brings us, if possible, still fewer rays of light.    It will hardly be contended that there is anywhere to be found in the charter of this defendant any provision requiring it first to determine in some certain manner the route which it is to locate upon.    Without such a provision, however, this second class is plainly inapplicable.

A statement of the facts in this case will be found, however, most clearly to negative any fancied analogy to this cause.

The defendant was a railway company deriving all its powers and franchises from the general statute of New York  regulating railroads; not having a charter of its own.

By the provisions of this general statute, certain differences were made, in regard to requirements, between railways whose tracks began and ended within a city's limits, and those extending outside the limits.

The statute also provided, *inter alia*, that a map showing the route, its courses and distances, should be filed with the clerk of the county before the construction of the road.

The defendant did file a map, which, however, was entitled a map of a *portion* only of its route, in which the termini of the road was marked as Newton within the limits of Brooklyn.    As a matter of fact, there was

both a Township of Newton, which was within the Brooklyn limits, and a Village of Newton, which was without those limits. The articles of association of the defendant described the terminus of the road to be the Village of Newton, and it acquired its franchise under the statute with that idea or understanding.

The plaintiff claimed, however, that the map which was filed having only shown its route to a point short of the city limits, the defendant was bound by that step, and could not extend its line further. The question of the alteration of the course did not enter into the consideration of the case, inasmuch as there was a specific power under the statute for the changing of the course with the consent of the directors and the common council. The particular fact in the case was that such a change of course had really been made under the statute. The point raised was as to the power of the company to extend its termini beyond the point set out in the map. If it could not do this, it fell under the provisions of the statute governing railways whose tracks were circumscribed by the city limits.

The court very properly ruled that the map could not prevail against the express provisions of the association under which the franchise of the company was acquired.

With such a statement of facts, it will be readily seen that the court in this case were considering a totally different question from that now before me, and that it could scarcely have been intended that the language of the opinion should be stretched beyond a state of facts analogous to those before it.

24

The case of The Hudson & Delaware Canal Co. v. The New York & Erie R. R. Co., 9 Paige (N. Y.), 323, will be found to fall within the second class of cases referred to in the 35 Barb. case, just alluded to.

The plaintiff sought to restrain the defendant from constructing its railway along the borders of plaintiff's canal.    One of the grounds raised by plaintiff's solicitor, and the one mainly considered by the Chancellor, was whether the construction of the road along the canal would constitute a change or alteration of the course or line of the defendant railway previously surveyed and marked out by it.

Thus far in the statement of facts, there is an apparent analogy to that in the Odessa & Middletown Railway, but an examination of the charter of the New York & Erie R. R. Co. will disclose the point of divergence which really exists.

By the fourth section of the original act of incorporation of the N. Y. & E. R. R. Co. (Laws of New York of 1832, page 404), the directors, after their examinations and surveys had been completed, were to select, and by certificates under their hands and seals, to designate the line, course, or way, which they should deem most advantageous for their railroad, and to file one of such certificates in the office of the register of the City of New York, and one in the clerk's office of each of the counties through which the railroad should pass; which line, as thus designated, was to be deemed the line on which the corporation should construct its road.

By this provision of its charter, it will be seen that the ruling of the court in the 35 Barb. case clearly applies to it; and as the court said in that case, the certifi-

cate of the course or line of the road became as if it were embodied in the original charter.

No language even remotely resembling that of the provision referred to, can anywhere be discovered in the act creating the defendant company now before me.

The court, as a matter of fact, decided, in the 9 Paige case, that the construction of the road along or near the canal would not constitute a change of the route already surveyed, but would only be in the nature of an extension of that line.

These comprise the entire list of authorities cited by solicitor for complainant, which have any bearing whatever upon the real questions involved in this present cause.

It will be seen that these cases may be grouped into three classes:

1st. Where, by statute, the finding at the inquisition was made to vest some right and fix some liability, such as the making of it a judgment upon which execution might issue, and the like.

2d. Where, by statute, some act or set of acts was made a location in the sense contended for; and,

3d. Where the object for which the charter was granted had been fully and completely enjoyed, and a new object was sought to be gained; such as the change of the line of a railroad after actual construction and operation.

It can scarcely be necessary to add that no case falling within any of the classes or groups above, can have the slightest pertinency or bearing to the cause now before me, since there are no such statutes in Delaware.

Before considering in detail the cases cited by coun-

sel for the defendant company, it will not be improper to recapitulate the points of contention raised.

The complainant insists that the action of the Odessa & Middletown railway in surveying one route, having commissioners appointed, and suffering those commissioners to meet and decide on the amount of damages for the disagreeing owners of land along such survey, amount to a location of its proposed road in the technical and restricted sense ·of the term; and that the effect of a location is to exclude any and all subsequent attempts at alteration or variation of the located route.

The defendant, on the contrary, contends that the real question is, not as to the effect of a location as employed by the complainant, but what constitutes or amounts to such a location; and claims that, except where they are based upon legislative statutes, which particularly specify what act or set of acts shall have such an effect, no cases or principles cited by complainant's counsel go further than that the actual laying down of the tracks, the construction and operation of. a road, amount to such a location.

It must be borne in mind that the charter and its supplements of this defendant company did not, and does not anywhere set out or define the route of the proposed railway, except as to specify its termini. On the contrary, a wide election as to the particular route to be selected is particularly conferred in section 6 of the charter, which provides:

" That the said company shall have power to survey, locate and purchase such lands and rights of way within the limits of New Castle County, as said company may deem necessary for their purpose," etc. Page 561, vol. 14, Laws of Delaware.

It may not be amiss to remark here, parenthetically, that the term " locate," as used here and in other portions of the charter, seems to have been employed so loosely and untechnically, as to convey the impression that it was used in this instrument more in the effort to employ the usual number of imagined synonyms in which legislative provisions abound, than with any intent as to a technical user.

Returning, however, to the general language of the provision quoted, it will be seen that this defendant company was given the broad power of selecting any route within the limits of New Castle County, so long as the termini were in the Towns of Odessa and Middletown.    Now, the point raised by the complainant, that the acts referred to  constitute a location in the most technical sense, entails the holding that those acts amounted to such an exercise of the power thus conferred as to totally and entirely exclude this power of election afterwards.

A few general principles of law may be laid down here whose truth can scarcely be gainsaid.

Except through *laches* or waiver (which are not contended as existing in this case), the power of election cannot be lost, except by such a selection of one of the subjects or rights embraced by the election as confers a positive right to the subject or right so selected, upon the party in whom the power of election once existed.

Applying this well-settled principle to the case in hand, I am led of necessity to conclude that those acts of the defendant company referred to, must be held to have at once given it an actual title to the land so first by it surveyed, or else the power of election has not been

exhausted. · Going but the next logical step further, I must also be of opinion that those same acts gave to the owners of the land covered by the first survey, an immediate legal claim to the value or damages for the land so surveyed, independent of any other act of the defendant, since there must be mutuality to confer rights, and the defendant could not acquire title to land without at the time rendering itself liable for its value or price. ·

If, then, the Odessa & Middletown railway did not, by the first survey, the appointment of commissioners and their decision as to the damages, immediately acquire a legal title to that land, or that the owners of the land did not at the same time acquire a legal right to recover judgment against said company for its assessed value or damages; the complainant's contention must necessarily fail.

Apart from any precedents upon the points I have just raised, the charter itself, of the defendant, seems well nigh sufficient in the language there employed, and its manifest intendment.

In section 6, above referred to, the following provision occurs:

"And the said freeholders" (commissioners to assess the damages), "or a majority of them, shall certify their finding and award to both parties, whereupon the said company, on paying the damages so assessed, or depositing the same in New Castle County National Bank, of Odessa, to the credit of said owner or owners, shall become entitled to have, use and enjoy said lands and rights of way for the purpose of said company forever." Chap. 513, § 6, vol. 14, p. 562, Del. Laws.

It seems very clear that by this language, two con-ditions precedent are, and were intended to be, attached to the vesting of title to lands in the defendant — first, the certifying of the finding or award of the commis-sioners to both parties; and second, the payment or de-posit of the damages assessed by the defendant.   Nev-ertheless, the statement of facts agreed upon by both parties, expressly negatives the performance of either one of these conditions, as it is specifically stated that the  commissioners did not certify their finding  and award to either party, and that the damages never were paid or deposited by the defendant.

It is, perhaps, quite true that with respect to the latter condition, that it was designed purely for the pro-tection of the landowner, and not in anywise for the benefit of the railway company, but it is, notwithstand-ing, a condition whose performance is expressly made necessary to the vesting of the title to the lands.

I will now proceed to review the most important and analogous cases cited by solicitors for respondent.

The Baltimore & Susquehanna R. R. Co. v. Nesbit & Goodwin, 10 How. 395.

This case came up to the Supreme Court of the United States on appeal from the District of Maryland.   The facts were that the plaintiff company had been incor-porated by the Legislature of Maryland, for the pur-pose of constructing a railroad from the City of Balti-more to some point or points on the Susquehanna river. To enable this company to acquire such lands, earth, timber, or other materials as might be necessary for the construction and repairing of the road, the law above mentioned, by its fifteenth section, authorized the com-

pany to agree with the owners of land and other materi-
als wanted for the purchase or use thereof, and in the
event of a disagreement with the owners, or that the
owners were legally disqualified to agree, this section
provided that a justice of the peace of the county, upon
application, should thereupon issue his warrant to the
sheriff to summon a jury, who, in accordance with the
directions contained in the same section of the statute,
should value the damages which such owners would sus-
tain, and that the inquisition, signed and sealed by the
jury, should be returned by the sheriff to the clerk or
prothonotary of his county, to be filed in court, and that
the same should be confirmed by said court at its next
session, if no sufficient cause to the contrary be shown.

This section further provides, that " such valuation,
when paid or tendered to the owner or owners of said
property, or to his, her, or their legal representatives,
shall entitle the company to the estate and interest in the
same, thus valued, as fully as if it had been conveyed
by the owner or owners of the same; and the valuation,
if not received when tendered, may at any time there-
after be recovered from the company without cost by
the said owner or owners, his, her, or their legal repre-
sentatives."

In accordance with the provisions of its charter, the
plaintiff surveyed its proposed route, commissioners were
duly appointed, the damages were assessed, the award
signed, sealed and filed, and in due course of time the
inquisition was confirmed and made a judgment of the
court.   In short, every act and condition set forth in
the charter was performed to the letter, with the soli-

tary exception that the damages assessed were not paid or tendered.

It will·be seen that this case is practically on all fours with the case now under consideration, except that the case in Howard goes further in that the finding or award of the commissioners was even made a judgment of the court.

Subsequently, and while yet the damages were unpaid and untendered, the Legislature of Maryland passed an act vacating the inquisition, and that the County Court direct an inquisition *de novo.* The plaintiff company then proceeded to tender the amount of damages previously assessed, together with interest up to the date of such tender, to the disagreeing owners, the defendants, which tender was refused. The County Court then, on petition, issued a rule on the plaintiff to show cause why the inquisition should not be set aside as directed by the statute referred to, and upon the hearing, did set aside the said inquisition, and ordered a new one.

The main question raised by the plaintiff before the Supreme Court was as to the legality of this latter act of the Maryland Legislature; the plaintiff insisting that the granting of the charter, the survey of the route, and the appointment and inquisition of the commissioners, conferred such a right upon it to the land in question that the new statute was in effect·an impairment of a contract, and hence unconstitutional.

The court decided that there was no impairment of the obligation of contracts, because not one and not all of the acts of the plaintiff company, of the meeting and assessment of damages by the commissioners, or of the confirming of the inquisition by the County Court, con-

ferred any right or title upon the plaintiff, or any right upon the owners of the land, and that hence the statute in question was valid.

The court, on page 3, of the opinion, say:

" Thus it appears that it is the payment or tender of the value assessed by the inquisition which gives title to the company, and consequently, without such payment or tender, no title could, by the very terms of the law, have passed to them."

And on the same page, say further:

" It can hardly be questioned, that, without acceptance by the act, and in the mode prescribed, the company were not bound; that if they had been dissatisfied with the estimate placed upon the land, or could have procured a more eligible site for the location of their road, they would have been at liberty before such acceptance wholly to renounce the inquisition. The proprietors of the land could have no authority to coerce the company into its adoption. This being the case, there could up to this point have been no mutuality, and hence no contract, even in the constrained and compulsory character in which it was created and imposed upon the proprietor by the authority of the statute."

It is difficult to imagine words more pertinent to this case than these of the Supreme Court. It is true that the question raised was not directly as to the power of the corporation to change its route, but the court manifestly perceived that the solution of such a question involved exactly the same principles as that really before them, and expressly allude to the right of the plaintiff company to have changed its route

so first surveyed at any time prior to the payment or tender of the damages.

I shall next consider the case of Graff v. The Mayor and City Council of Baltimore, 10 Md. 544, with some degree of minuteness, more particularly because the solicitor for complainant, in his brief, relies upon the opinion of the court in that case as " questioning the authority, as it may properly do," of the ruling in 10 How., just considered.

The facts were as follows:

By the act of 1853, power is given the mayor and city council of Baltimore to " agree with the owner or owners of any land, real estate, spring, brook, water or watercourse, earth, timber, stone or other materials, which the said mayor and city council of Baltimore may conceive expedient or necessary to purchase and hold, for the purpose of introducing water into the said city," and provision is further made, in the event of a disagreement with such owners, for summoning a jury " to inquire into, assess and ascertain the sum or sums of money to be paid by the said mayor and city council of Baltimore, for the land," etc.; the inquisition of the said jury to be signed and sealed and filed with the clerk of the Circuit Court of the county, and be confirmed by said court at its next term, unless, etc. *"And such valuation, when paid or tendered to the owner or owners of said property, or his, her or their legal representatives, shall entitle the said mayor and city council of Baltimore, to the use, estate and interest in the same, thus valued, as fully as if it had been conveyed by the owner or owners of the same."*

Under the act referred to, an ordinance was passed by the city adopting a plan for the introduction of water over, among other lands, the property of plaintiff. The plaintiff was at that time in the act of making improvements on the property in question, and was notified by the city to desist, as his land was to be taken for the purposes aforesaid.

Subsequently, the jury was summoned, the inquisition held, the damages assessed, and the finding returned to the proper court, which confirmed the inquisition *nisi*.

Still later, the city passed another ordinance repealing the former one, and directing its counselor to resist the confirmation of any and all inquisitions held under the provisions of the first ordinance. Nevertheless, the Circuit Court, to which the inquisition had been returned, after full argument, ordered it to be ratified and confirmed. The plaintiff then demanded the amount of the damages so assessed to him, and on refusal, applied for mandamus to compel the payment, alleging that he had suffered from the holding of the inquisition by the stoppage of his proposed improvements, counsel fees, etc.

Tuck, Justice, in delivering the opinion of the court, first states the questions involved, and then refers to the case of The B. & S. R. R. Co. v. Nesbit, in 10th Howard, as being identical in material facts and points raised with the case before them, and says that this case " is decisive of this appeal, if we are to recognize that decision as authority." The learned judge then proceeds to fully and completely uphold and indorse the ruling in 10th Howard, quoting copiously from that

case with approval, and deciding the case before him upon its strength.

I will quote at large from the opinion, in order that the mistake of solicitor for complainant, in declaring that it questions the authority of the 10th Howard case, may be clearly shown.

On page 551, the court say:

" Upon the first, we agree with the appellee's counsel, that the case of The Baltimore & Susquehanna R. R. Co. v. Nesbit, 10 How. 395, is decisive of the present appeal, if we are to recognize that decision as authority. The charter of that company, as far as concerns the present inquiry, is substantially the same with the act under which the claim of the appellant is now made. Why different constructions should be placed upon them, we do not perceive. If the title to the land condemned under the first of these laws did not vest in the company, because the valuation had not been paid or tendered, it follows, that such payment or tender was necessary to give title to the City of Baltimore in the property of the appellant. The court " (in 10th Howard), " say: ' it can hardly be questioned that, without acceptance by the acts and in the mode prescribed, the company were not bound; that if they had been dissatisfied with the estimate placed upon the land, or could have procured a more eligible site for the location of their road, they would have been at liberty, before such acceptance, wholly to renounce the inquisition. The proprietors of the land could have no authority to coerce the company into its adoption. This being the case, there could, up to this point, be no mutuality, and hence no contract, even in the constrained and compulsory character in

which it was created and imposed upon the proprietors by the authority of the statute.' And, in another part of the opinion, these terms are called ' conditions indispensable to the vesting of a title in the company.' Now, if the title does not vest in the city until payment or tender, and the owner could compel payment by legal process, there would be no mutuality. The city might be required to pay for land that it may never use or need for the purposes of the act. This certainly would be a hardship upon the citizens of Baltimore, from which we think they should be relieved *by adopting the interpretation of the Supreme Court in the case cited.*"

It seems only necessary for me to say that, in the face of such a plain and express indorsement of the ruling in the 10th Howard case, by the court in 10th Maryland, I cannot imagine that it will longer be seriously contended that the latter questions the former, but, on the contrary, that it entirely sustains and upholds it in every particular.

The case in 10th Maryland may, however, be further cited against yet another point made by solicitor for complainant, namely, that a decision in favor of the right of a railway corporation to abandon, after inquisition, one proposed route for another, would be of great injury to the owners of land along the first route, since the survey and inquisition would have the effect of putting a stop, at least temporarily, to proposed improvements on the land, beside putting such owners to the inconvenience and expense of proving their damages at the inquisition afterwards abandoned.

I do not think this point can be better or more fully answered than by a quotation from the case in 10th Maryland, on which the solicitor has relied as a refutation of the ruling in 10th Howard.

On page 552 of the opinion, the court say:

" This may be a severe system of legislation, as was said, because it places the property-owner at the discretion, not to say caprice, of the other party, by allowing it to condemn and afterwards abandon the property. But this construction is not likely to work so much injustice as that contended for by the appellant, because, by the latter, the city is deprived of all choice of another location, after a condemnation is once made and affirmed, no matter how great the necessity might be afterwards for adopting another, even if the owner of the land condemned had not sustained any damage by the act of the city in making the condemnation. These inquisitions too often tax the corporation beyond the value of the lands, or the damages sustained, and the only relief it has against such wrongs is to decline taking the land; of this, the owner cannot complain. In cases, however, where the owner has suffered loss by the acts or delay of the corporation, redress might be had in another way. And this is an advantage which he has over the other party." And the court concludes that the owners of land so condemned and then abandoned by the corporation, do in fact have a remedy for any loss they may sustain by such condemnation and abandonment.

Here, then, is a complete answer to the main objection raised by complainant — that the power to choose another route oppresses the property-owners along the

first route; besides, being a sufficient guarantee that corporations will not capriciously, or for the purpose of " chaffering with landowners," resort to inquisitions, since the condemnation alone, whether accepted or abandoned, confers upon the owner a full redress for any and all loss sustained, and a consequent liability upon the corporation for such redress.

Further, in regard to the authority of the case in 10th Howard, the following cases, hereafter considered in detail, cite that case with approval and indorse its ruling to the fullest extent. Graff v. M. & C. C. of Balt., 10 Md. 544; Norris et al. v. M. & C. C. of Balt., 44 id. 298; Stacey v. Vermont Cent. R. R. Co., 27 Vt. 39; Burl. & Mo. R. R. Co. v. Sater, 1 Clark, 421; State ex rel. Hayes v. Cin. & Ind. R. R. Co., 17 Ohio St. 103; Gear v. Dubuque & Sioux City R. R. Co., 20 Iowa, 523.

Norris et al. v. The Mayor, etc., of Baltimore, 44 Md. 598.

The facts were as follows:

Under an ordinance of the defendant, a jury was summoned, inquisition held, damages assessed for the taking of plaintiff's land, the award returned and made a judgment of the proper court. For several months, defendant neither paid nor tendered the assessed damages, nor abandoned the inquisition or the proposed location. The language of the act under which the inquisition was held, was similar to that in the 10th Howard and the 10th Maryland cases, just before considered, as to the payment or tender of the damages before title to the land passed. Finally, the defendant did pay the damages, but plaintiff demanded interest on this amount from date of condemnation to time of payment of principal

sum, which was refused.    The recovery of this interest was the object of the controversy.

It will be seen from this statement that no question, either of the actual abandonment of the inquisition, or of the right of the defendant to have chosen another site, was directly involved in this case, but the opinion of the court is, nevertheless, of strict relevancy to this issue, because it contains rulings upon the main points insisted upon by complainant; and so necessary to the solution of the actual point involved were the rulings upon these points, that they cannot, with any show of reason or comprehension of the principles adjudicated, be classed as *obiter dicta.*

On page 604 of the opinion, the court say:

" It has long been the settled law of Maryland, that both *private* and municipal corporations, when authorized to execute the power of eminent domain, have the right to renounce the inquisition and select a more eligible route, or to wholly abandon the improvement or enterprise, at any time before actual payment of the amount assessed, either by commissioners or jury, and until that time, no title to the property condemned vests in the corporation.    Balt. & Susq. R. R. Co. v. Nesbitt, 10 How. 395; Graff v. Mayor & C. C. of Balt., 10 Md. 544; State ex rel. McClellan v. Graves, 19 id. 351; and Merrick, Admr. of Warfield, v. Mayor & C. C. of Balt., 43 id. 219."

In this quotation, the court cites the case in 10th Howard and that in 10th Maryland, in, as it were, the same breath, and to uphold the same principle.

Evidently the court did not concur in the opinion of solicitor for complainant, that the latter of these two

25

cases " questioned the authority " of the former. This undoubtedly settled any question as to the weight of the 10th Howard case in Maryland.

The quotation is of a far broader and longer reach, however, than as to this one point.

The complainant's solicitor insists that those cases in which public or municipal corporations are one of the parties, must not be taken as decisive of controversies between private corporations and individuals. From the language quoted from the opinion, it is manifest that, in Maryland, at least (whose statutes seem substantially similar to those usually passed in Delaware), the ruling of the courts upon the effect of inquisitions and condemnations under power of eminent domain, applies indifferently to both classes of these artificial bodies.

On the same page, the court say further:

" We may remark, however, that we have seen no case, and think none can be found, which has gone to the extent of deciding that the mere assessment of damages by commissioners or a jury constitutes such taking. Such assessment is simply a mode prescribed by law, for ascertaining the value of the property to be taken, or the damages that will be sustained by the taking. It is a step preliminary to the taking, and not the taking itself."

And on page 607, it is laid down that:

" But when the assessments have all been finally settled, the city can then fairly exercise its election to abandon the enterprise, or pay the assessments and proceed with the work."

By these words, it will be seen that the " election " vested in the party in whom the power of eminent domain resides, is not lost or waived until payment or tender, simply because until that time no interest has devolved upon the holder of such a power, and, therefore, there is no just cause for the loss of the election.

When it is borne in mind that practically the same language as to when title to the land sought passes (on payment, tender, or deposit), was employed in the statutes under which the corporations, which were parties in the cases in Maryland just reviewed, acted, is used in the charter of the Odessa & Middletown Railway, this respondent, the rulings in the Maryland cases would appear to apply to the cause before me with peculiar force.

Solicitor for complainant insists that all authorities, which do not involve the question of the power of a railway corporation to change a route which has been surveyed and for the condemnation of the lands along which an inquisition has been held, and which simply go to the extent of holding that such survey and inquisition alone do not vest title to the land in the corporation, or do not give a legal right to the landowners to recover the damages assessed, are not relevant or pertinent to the case now before me.

Now, the material point made by complainant is, that a location precludes a change of route, unless such change is expressly authorized in the charter; and that a survey and condemnation of the lands constitute a location in this sense and to this effect.

I think that those cases which hold that no title vests in the corporation on the one hand, and no right to the

assessed damages accrues to the landowner on the other by the survey and condemnation proceedings simply, may and do have a peculiar force and weight in the decision of this case.

It must certainly be admitted that there can be no location, in any sense or meaning of the term, without a legal right to locate; without such a right, whatever the acts or things done, they can in no event amount to more than a trespass. Suppose the charter should fix the route of the proposed railway by courses and distances, metes and bounds, but the corporation should nevertheless cause another and different route to be surveyed and condemnation proceedings to be had on such different route, could this be held to be a location of their road? Could it be anything other than a trespass?

A location is not a mere right, it is an act; it is not the power to do a thing, it is the thing itself. This is necessarily involved in the contention of solicitor for complainant.

If, then, the location of a railroad is the actual settling of the road on the land indicated, there must exist the legal right to so settle that road on those particular lands where the location is claimed, or it is a trespass and not a location. But if no title vests in the corporation by the survey and condemnation merely, or (which is correlative) no legal right to the assessed damages accrues to the landowners by such proceedings alone, there can be no legal right in the corporation to locate its line. If such a right did exist under such circumstances, then that provision in the charter in the present case requiring payment or deposit of the damages before title passes is absolutely void and of no effect, and this

defendant company might have treated it as such and gone on the land at its will, leaving the owners with merely the right to sue them for those damages. Our legislatures have, however, considered that it would be au injustice and oppression to give to the owners of property in such cases, a mere right or chose in action; and it was for their benefit alone that the payment and deposit was made a condition precedent.

Here, then, the contention of complainant is reduced to this, that the line of a railroad may be located in the strictest sense of the term, and yet there be in the company absolutely no right to further go upon that land, or to make one step towards its construction. This would, indeed, present an anomalous state of things paradoxical in the extreme.

Let me state this point in yet another form. A location, in the sense contended for by solicitor for complainant, constitutes an unalterable, unchangeable fixation or establishment of the proposed road, as fully and completely in its effect as if the actual roadbed were constructed and the rails actually put in place. By a general statute or a particular provision in a particular charter, such an effect could, of course, be produced at any time or by any action of the company or other party, however insignificant in itself; but in a case where no such general statute prevails, and in a charter where no such provision is to be found, it would be palpably unreasonable to hold that such a violent and far-reaching effect could be produced except as the natural consequence or result of some act or step which of itself fixes and establishes some right or power sufficiently important to warrant such a result.

Now, complainant insists that the condemnation pro-
ceedings is the step which produces the effect contended
for.    It is proper, therefore, to inquire why and how
it does.    It is not pretended that the survey alone would
cause such a result, and yet why should it not?    Cer-
tainly, there can be no reason for such a difference in
effect unless it is shown that the condemnation pro-
ceedings have, either of themselves or by force of some
statute or legislative provision, the effect of fixing or
vesting some right or interest which the survey does
not.    Then, surely, all cases which throw any light on
the effect of a condemnation of land are of peculiar
relevancy to the matter in hand, and should be import-
ant aids to its just and proper solution.

In order that this shall be absolutely true, however,
only those cases where no general statute affects the
operation of the inquisition and where the language of
the particular charter is substantially similar to this de-
fendant company so far as it relates to that act, may be
taken into consideration.

With this well in mind, it will be found, I think, that
the following cases are illustrative of the force and effect
of the condemnation proceedings.

In Stacey v. Vermont Central R. R. Co., 27 Vt. 39,
the charter required the payment or deposit of the as-
sessed damages before title to the land should pass to
the company.    I will quote from the opinion:

" They " (the company) " derive no title to the land
or any easement growing out of it from the fact of their
having surveyed the road across the plaintiff's land, or
having placed that survey on record, nor by having the
damages appraised by commissioners, and causing their

award to be recorded.    This statute is express, that the payment or deposit of the money according to the award must be made before any such right accrues.    Until that payment is made, the company have no right to enter upon the lands to construct the road or exercise any act of ownership over the same.    A court of equity would enjoin them from exercising any such right, or they might be prosecuted in trespass at law.    The survey and appraisal of damages are merely preliminary steps to ascertain the terms upon which the land can be taken for such purposes, if the company shall see fit to use the same for the construction of their road.    If it is accepted, and the company conclude to take the land, that acceptance  and that taking is consummated only by a payment or deposit of the money, for the use of the owner of the land, as directed and awarded by the commissioners."

And on page 46, the court say further:

" When the corporation obtains a vested right to the land, or to the easement, the landholder has a vested right to the damages; that specific act which vests the right in them gives also a vested right to the owner of the land.    These respective rights are correlative and have a reciprocal relation; the existence of one depends upon the existence of the other.    If the corporation have no vested right to the land, the owner of the land has no vested right to the price which was to be paid for it."    State ex rel. Hayes v. Cincinnati & Indiana R. R. Co., 17 Ohio St. 103.

In the charter of the railway company and under the Constitution, payment or deposit of the assessed dam-

ages was made necessary to the vesting of title to the land condemned.

The defendant company proceeded to have its proposed route surveyed, and instituted condemnation proceedings under the law. The inquisition was held and the damages assessed. The company then entered on the record of the court out of which the inquisition proceeded a note of their abandonment of that particular route, and afterwards did *actually* construct their road over another and *different* route and over different lands.

The direct question raised was whether the proprietors of land along the first route could recover the assessed damages. So far as I can ascertain, however, no express power of abandonment or of a change of route is anywhere given to the defendant company in its charter or any general statute; and if such power did exist it must have been drawn inferentially from language similar to that employed in the charter of the Odessa & Middletown railway.

The following points were ruled by the court:

" That no appropriation of the lands of the relators could be completed, no title from them could be acquired, and no incumbrance could be imposed upon their estate by the railroad company until the amount of compensation fixed by the finding of the jury was paid in money, or secured to be paid by a deposit of money."

" That the finding of the jury not being complied with, the relators are in *statu quo,* as if no proceedings in the Probate Court " (the condemnation proceedings) " had ever been commenced. They have lost nothing and are not entitled to complain of anything. The rail-

road company having abandoned all claim to a right of way over the land of relators, it could not thereafter acquire such right of way except by the commencement of proceedings " (condemnation proceedings) " *de novo,* and, perhaps, not even by such means."

" If there were no express abandonment of the claim to appropriate a right of way entered of record in the proceedings of the Probate Court, the fact that the corporation had constructed its road upon another line, not touching the lands of the relators, is conclusive evidence of such abandonment, and leads to like results."

" And we are furthermore unanimously of the opinion that if there were no express abandonment of claim in either of these ways, it would be the right of a landowner, immediately after verdict and its condemnation, by a demand from the corporation of the amount assessed in his favor, to compel it to elect whether it would complete its appropriation by the payment of the money, or on failure to do so promptly, within a reasonable time, submit to be held to have abandoned its claim and to have subjected itself to whatever consequences are involved in such abandonment. It would be intolerable that the landowner should be hung up in uncertainty in respect to his rights by the nonaction of the corporation."

In Cape Girardeau & Scott County Macadamized Road Co. v. Dennis, 67 Mo. 438, the court held that the plaintiff had the right to alter its proposed route after condemnation proceedings, but before actual construction over the land so abandoned, though this power of alteration or of abandonment was not expressly given by the special act or the general statutes. In

this case, also, the question as to the power of the altera-
tion was particularly raised.

In Schreiber et al. v. Chicago & Evanston R. R.
Co., 115 Ill. 340, the court, on page 344, say:

"Our statute provides that 'the judge or court shall,
upon such report,'— *i. e.*, report of the jury assessing
damages — 'proceed to adjudge and make such order
as to right and justice shall pertain, ordering that peti-
tioner enter upon such property and the use of the
same, upon payment of full compensation, as ascertained
as aforesaid; and such order, with evidence of such pay-
ment shall constitute a complete justification of the tak-
ing of such property.' R. S. 1874, p. 477, § 10. And
so we have held that, until the compensation is paid,
there is no right to enter upon the premises — that until
that time, the company seeking condemnation has the
right to abandon the location and adopt another."

It will be noted that the court here use the term
"location" in a sense diametrically opposed to that con-
tended for by solicitor for complainant. The court rule
that a change of route may be had by the company
after such acts or proceedings as constitute what they
see fit to denominate a "location."

It will be remembered, however, that even in the
opinions of courts, terms which have both a technical
and restricted meaning and also a popular and broader
signification may and often are used in either sense.

The court, continuing, held that no rights vested until
compensation actually paid, neither in favor of the pro-
prietor nor of the company, and that until then, in ef-
fect, the case stood as though no steps had ever been
taken by either in the matter of the proposed railway.

In Gear v. Dubuque & Sioux City R. R. Co., 20 Iowa, 523, condemnation proceedings were had at the instance of the railroad company; under the provisions of the general statutes of Iowa, freeholders were summoned by the sheriff as commissioners, who duly made their award assessing the damages, which were returned to the proper court, an appeal was taken by plaintiff, a property-owner, but the first award was confirmed by the court. It must be noted that nowhere does there appear in the law under which the defendant company secured its powers as a corporation, and under which the condemnation proceedings were had, that any power of abandonment of the inquisition or right to alter or change their route was given. There was, however, a provision requiring the payment of the damages before the actual taking of the land.

This state of facts puts this case on all fours with that now before me. I will quote from the opinion:

" But let it " (the selection of a proposed route by a railroad) " depend upon whatever it may, the right of the company to fix the route primarily, and to change it in advance of (and perhaps after) actual construction, in accordance with their own discretion, is a right which cannot now be questioned.

" If the company shall take steps for the condemnation of a right of way, and find the assessment beyond their ability or interest to pay, it may change its route to such locality as may be within their ability to pay or interest to adopt. But, of course, in case of any change of route, after proceedings for condemnation are concluded, the company would be liable not only for the costs but also for any expense in removing fences or

buildings, or forbearance to cultivate the land, if the same were incurred or done at the instance of the company, and upon the faith of its acceptance of the route and assessment. It is true that this construction of the law places it in the power of the railroad company to make changes in their routes and to cause repeated assessments to be made on different routes of the value of their right of way. But the only restraint upon such a course within the power of the courts is the visitation of the costs and the incidental liability mentioned above. If the right to make such changes and take such repeated proceedings is an evil, it is alone within the power of the Legislature to prohibit it."

Burlington & Missouri River R. R. Co. v. Sater, 1 Clark, 421.

This was a case in which the railroad company desired to condemn lands for a right of way over the lands of defendant. A jury was drawn and damages assessed, an appeal was taken by defendant, after which he petitioned for a change of venue. Then the company wished to abandon the proceedings and the right of way.

The court say, on page 422: "In this case, it appears that the company, in the construction of their road, desired the right of way over the defendant's land. To assess the damages, a jury was called. With their award the defendant was dissatisfied, and appealed to the District Court. Up to this time the company had acquired no right to the land, nor any easement therein, and could not until the payment of the money. * * * The company, therefore, had a perfect right to abandon the proposed route, and upon the payment of full costs, for this or any other reason dismiss the proceedings."

The case goes on and cites the 10 Howard case.

And now, to-wit, this 15th day of November, A. D. 1895, the motion to dissolve the preliminary injunction issued in this case having been heard before the Chancellor on the 12th day of October, A. D. 1894, upon bill and answer and a statement of facts duly agreed to by solicitors of the respective parties, and having been debated by them and the same having been held under advisement until this day, it is now ordered, adjudged, and decreed by the Chancellor that the preliminary injunction be and the same is hereby dissolved.